17104

CLARA M. LONG, Appellant, v. METROPOLITAN LIFE INSURANCE COMPANY, Respondent

(90 S. E. (2d) 915)

*Messrs. W. E. Bowen* and *Frank Simpson,* of Greenville, *for Appellant,*

*Messrs. Haynesworth, Perry, Bryant, Marion & John-stone,* of Greenville, *for Respondent,*

*Messrs. W. E. Bowen* and *Frank Simpson,* of Greenville, *for Appellant, in reply,*

January 10, 1956.

Legge, Justice.

Appellant, as beneficiary of a policy of insurance in the face amount of $500.00 issued by respondent on the life of her late husband, Robert A. Long, brought this action to recover the additional death benefit of $500.00 provided in the "double indemnity" clause of the policy to be paid "upon receipt of due proof that the death of the insured resulted, directly and independently of all other causes, from bodily injuries caused solely by external, violent and accidental means". It was stipulated at the time of the trial that the face amount of the policy had been paid to appellant; and the only issue before the court was whether respondent was liable for the additional death benefit above mentioned. In its answer, respondent denied that the death of the insured had resulted from bodily injuries caused solely by external, violent and accidental means as alleged in the complaint, and alleged that his death was suicidal and therefore within the exclusion clause of policy reading as follows: "The additional death benefit shall not be payable if the insured's death * * * is the result of self-destruction, whether sane or insane". At the conclusion of all the testimony, respondent's counsel moved for direction of a verdict upon the following grounds:

1. That the plaintiff had failed to prove an accidental death within the meaning of the policy, and

2. That the only reasonable inference from all the testimony was that the insured had committed suicide.

The trial judge granted the motion on the second ground, and the correctness of his ruling is challenged by this appeal.

About nine o'clock on the morning of Monday, January 25, 1954, one Curtis Smith, driving a tractor-trailer loaded with automobiles from Detroit, Michigan, for delivery in South Carolina, was proceeding slowly up-grade on U. S. Highway 25 in the mountainous part of North Carolina about a mile north of the North Carolina-South Carolina

line, when a man, whom he had never seen before, walked toward him from the east side of the road, signalling him to stop. He did so, and the stranger came up to him, saying that he had been shot, and handing him a piece of paper in which a coin was wrapped, asked him to call the telephone numbers that he had written there. Smith asked the man if he could help him in any way, but the latter replied in the negative and repeated his request that Smith call the numbers written on the paper. The man, who was apparently sober, and about whose manner of walking there was nothing abnormal, showed no sign of injury, of any kind. Nobody else was in sight. There was a 1950 or 1951 model Buick automobile, with South Carolina license plate, parked off the road, on the east side, headed north. Smith, who had frequently travelled this route, proceeded south on U. S. Highway 25 about eight miles to a roadside motor court and restaurant where he knew there was a telephone. There he told the proprietor of his encounter with the stange man, and together they opened the paper, which Smith had not opened before. It appeared to be the inner wrapping of a package of cigarettes, one side being coated with tinfoil, and in it was wrapped a twenty-five cent piece. On the white side of the paper was scribbled in pencil these words:

"Please call my wife 56436 or 53783

Deaf and Dum in the car

"Bob Long
"Greenville"

Smith testified that he thereupon called the first number, but received no answer; that he then called the second number and a lady answered, and he told her of the incident, of which she said that she knew nothing; and he then informed her of his whereabouts and stated that he would remain there if he could be of further help. Having waited at the restaurant for some thirty minutes without receiving a call, Smith left the pencilled note and the twenty-five-cent piece with the proprietor, and then proceeded on his journey. He had gone a few miles when he was stopped by two deputy sheriffs,

who asked if he was the person who had informed the proprietor of the restaurant and had made the telephone calls before mentioned. He recounted the story to them and thereupon resumed his journey.

Paul Batson, a deputy sheriff of Greenville County, testified that on January 25, 1954, he and another deputy were assigned to investigate a report that had been telephoned to the sheriff's office about 9:40 that morning, to the effect that a man in a 1951 Buick automobile had been shot near the North Carolina line. These deputies went to the motor court-restaurant before mentioned, interviewed the proprietor, procured from him the note and the twenty-five-cent piece, and then, turning back, overtook the tractor-trailer and questioned the truck driver as before stated. They then proceeded northward on U. S. Highway 25 to Hendersonville, North Carolina, looking for the man and the Buick automobile, but found neither, and thereupon returned to Greenville.

From its junction with U. S. Highway 25 at the village of Travelers Rest, some nine miles north of Greenville, U. S. Highway 276 (known as the Geer Highway) runs northwest through Caesar's Head, South. Carolina, to Brevard, North Carolina. As one travels this highway from Travelers Rest toward Brevard, the highway climbs steeply from the Wild Cat Service Station to Ceasar's Head, a distance of several miles.

At 8:05 a. m. on the morning of January 26, 1954, a bus driver, on his way from Brevard to Greenville, telephoned the sheriff's office in Greenville to report that he had found a man dead in an automobile on the Geer Highway about a mile and a half above the Wild Cat Service Station. Deputy Batson and the other deputy who had accompanied him on his search the morning before proceeded to this location and there found Robert A. Long dead, slumped forward on the rear seat of his 1951 Buick automobile, his head almost touching the floor, and an oily rag in his left hand. On the floor of the car was a small pistol

of foreign make. The car was parked on a wide "pull-out" or "turn around" place on the right-hand side of the highway from the standpoint of one driving from Travelers Rest to Caesar's Head, and of course in plain view. Mr. Batson testified that there was at the car Mr. R. R. Reese, from whom he got certain information as the result of which he looked in the back seat of the car. Reese did not testify. The automobile doors were closed when Batson arrived. Batson testified that the car fitted the description given him the day before by Smith, the truck driver.

Following Batson's telephone call to the sheriff's office, the Coroner, Chief Deputy Sheriff Putnam, Deputy Sheriff Gerald, and a photographer, came to the scene. Deputy Batson testified that pending their arrival, and until the pictures were taken, nothing about the car had been touched or disturbed.

Deputy Sheriff Gerald testified that there was nothing about Mr. Long's clothing or the interior of the car indicating that there had been any struggle; that there were in the chamber of the pistol one empty and two loaded cartridges; and that the oily rag, which he examined, was powder-burned. He did not examine the body, which was taken to the Greenville Hospital for autopsy.

Dr. J. I. Converse, who performed the autopsy, testified that the only evidence of violence found on the body was a wound made by a bullet that had entered the chest at the anterior sixth interspace, two inches left lateral of the sternum, had penetrated the lower lobe of the left lung, the heart, and the lower lobe of the right lung, and was recovered from under the skin in the tenth posterior interspace in the posterior axillary line. Dr. Converse also testified that there were marked powder burns around the entrance of the wound.

Robert A. Long was 46 years of age at the time of his death. He and his wife, appellant here, and their three children, lived on the outskirts of Greenville, next door to

her mother's residence. He had been employed at the Greenville disposal plant and his wife worked as clerk in a department store. Following is the substance of her testimony in chief:

Mr. Long's car, a four-door sedan, had been left, on the night of January 24, 1955, parked as usual alongside, and within about three feet of, their house, in the driveway, and headed towards the street, the driver's side of the car being farthest from the house. The front of the car was covered, for protection against frost, with a piece of canvas which extended as far back as the front part of the windows of the two front doors. At about 5:30 in the morning of January 25, Mr. Long aroused his wife and told her that he thought someone had been in the car, because the door was open. To quote from her testimony:

"He said when he went to get the morning paper he saw a man standing at the driveway; and I told him to go see what had happened to the car. So he came on back in and he acted like he was kinda afraid. He wanted me to go call the police, and I said 'you go'. We had to go to my mother's next door, and I told him to go and he didn't want to go.

"Q. You didn't have a telephone in your house? A. No, sir. I have one now. I said if he was afraid to go out I wasn't going out myself and it dark.

"Q. Then what else took place? A. So he put on his boots—he had on his house slippers—like he was going to work; so when he started to leave he wrote his brother's telephone number down and the number of the tag and told me to call 'Rufe' if he didn't come back, so, when he left, he said, 'Well, I'll see you about 9:00 o'clock'—that's when he usually came in the store and had coffee.

"Q. What was it he told you to do if he didn't come back? A. To call his brother.

"Q. Then he said what about come to the store? A. He said he would come in and see me but he didn't. So he says,

'If there's anybody in the car I'll just get in and take them on away from the house. I'll flash the car lights if there's anybody in there!

"Q. Did he say how many times he would flash the car lights? A. No. And I thought, well, maybe he is just doing that.

"Q. Did he go out to the car? A. Yes.

"Q. Did he flash the lights? A. Yes, sir, he flashed the lights.

"Q. And did the car drive off? A. Yes. He went off with the car.

"Q. You say he seemed to be afraid of something? A. Yes, sir, he seemed awfully nervous.

"Q. What did you do, if anything? A. Well, I didn't do anything right then. I went on to work. I thought maybe he would come on to the store like he generally did sometimes.

"Q. Did you call anybody? A. After he didn't pick me up, I called his brother.

"Q. And then you—when did you learn about his death? A. The next day. His brother came over and he said—

"Q. You can't tell what his brother said. That wouldn't be competent. Where did you see him? At the hospital? A. My husband? Not until after they had brought him home.

"Q. That was after he was embalmed and in the casket, I guess. A. Yes.

"Q. By the way, was your husband a righthanded man or lefthanded? A. He was righthanded.

"Q. About what size man was Mr. Long? A. You mean how tall?

"Q. Yes, and how much did he weigh? A. He was five (5') ten and a half (10½) or eleven (11) and weighed a hundred fifty-five (155) or sixty (60).

"Q. Did you ever see him with a pistol around your house? A. No, sir, I didn't know he had a gun.

"Q. Have you seen the gun that was in the car that the officers got? A. They gave it to me

"Q. Had you ever seen that gun before? A. No, sir, I hadn't.

"Q. And he was right handed? A. Yes, sir, he was right handed."

Under cross-examination she stated that the conversation with regard to telephoning the police took place before Mr. Long had dressed; and that after he had dressed he drank his coffee and made no further reference to calling the police, but told her he would flash the light if anybody was in the car. To quote from her testimony under cross examination:

"Q. Now, you then assumed somebody was in the car with him when he flashed his lights. Is that right? A. Yeah.

"Q. And you saw he was scared and nervous and hadn't even wanted to go next door and call the police? A. That's right.

"Q. Yet, with all that, Mrs. Long, and his flashing the lights—by the way, what time was that? A. It was still dark. About a quarter 'till 6:00.

"Q. But with all those things, Mrs. Long, you didn't, after that car left and the lights were flashed, you didn't call the police or his brother did you? A. I called them after I came from work.

"Q. You called the police? A. I called his brother.

"Q. This happened at a quarter of 6:00 in the morning. What time do you go to work? At 9:30 when the store opens? A. Yeah.

"Q. He left approximately at a quarter of 6:00 in the morning and you went ahead and got dressed and ate your breakfast. Did you see your mother that morning? A. I think I did.

"Q. All right, and you went on and got on a trolley and went on to work? A. Yes.

"Q. Where he worked has a telephone out there; he can call you and you can call him. A. At the disposal plant? If he's not in the office, they have to go out and hunt him up.

"Q. They know when he goes to work, don't they? A. He was foreman there.

"Q. If you were worried about those flashing lights, you could have called the police or his brother Rufus or out to the plant, couldn't you? A. After we check in, we check our pocketbooks in and we don't have money on the floor; and we are not supposed to use the store phones.

"Q. Mrs. Long, I am talking about before you went to the store. Your mother who lives next door has a telephone right next door and it doesn't cost you a penny to use it; and you had from a quarter to 6:00 until you went to work to call, didn't you? A. Well, lots of times I had called but I couldn't get him to the phone; and he said he might meet me at 9:00.

"Q. Mrs. Long, you didn't call, did you? A. No, I didn't.

"Q. And you didn't call your brother-in-law? A. Not then.

"Q. And you didn't call the police? A. No.

"Q. And your husband didn't meet you at 9:00 o'clock? A. No.

"Q. And you went on to work and you never made any request of your manager to call to see if he was at work. A. No, I didn't.

"Q. You had your lunch hour, didn't you? A. Yes.

"Q. But you made no effort during your lunch hour to call. A. No.

"Mrs. Long, after you got off from work, got on the trolley—you get off at 5:30, don't you? A. Yes.

"Q. You went home on the trolley? A. I waited about half an hour for him to pick me up.

"Q. What time did you call Mr. Rufus Long, your brother-in-law? A. About 6:30; it was after I got home.

"Q. You called to ask had he seen him? A. That's right.

\* \* \*

"Q. Mrs. Long, you came to the Sheriff's office and claimed, I believe, the pistol that was in the car with your husband. A. Yes.

"Q. You came down and claimed the gun and gave them the receipt. They didn't turn it over to you until you claimed it was being yours, did they? A. I just came up for his coat and things.

"Q. And his pistol too. A. Well, yes, it was there.

"Q. And you signed the receipt for it, which is in the files, saying that you had received the pistol. A. Yeah.

\* \* \*

"Q. Did Mr. Long ever go off on trips by himself? A. He did.

"Q. For no explained reason? A. That's right.

"Q. Did he seem nervous when he went off on those trips? A. No.

"Q. Upset or anything? A. Well, he would come back home like he had gone off.

"Q. He would go off for several days at a time. A. That's right.

"Q. And he did that on a number of occasions. A. He did.

"Q. That's all."

On re-direct examination she was asked why she had not regarded more seriously what her husband had said about flashing the car lights as a signal that someone was in the car with him; and her reply was "Well, lots of time he would do little ol' odd things".

By agreement of counsel there was admitted in evidence the following memorandum statement signed by Dr. Larry McCala:

"Re Robert Long                    6-5-07 Birth
Admitted 8-25-1953
Discharged 9-23-1953
Adm. Diagnosis: Injury to leg
Final Diagnosis: Psychoneurosis
This 46 white male states he has had pain in right leg since operation for hernia. Pain is described as cutting 'knife-like'."

Mr. Rufus C. Long, the deceased's brother, who at one time had been an investigator in the office of the sheriff of Greenville County, but who at the time of the trial was a building contractor, was a witness for the defendant. He testified that he had been devoted to his brother and had looked after him during the last few months of his life; that within the last two years his brother had several times spoken to him about committing suicide; that about a month before his death Robert had driven up to the witness' home with a gun in his hand and had said he was going to commit suicide, and that after Rufus had talked with him for more than an hour Robert quieted down and left, saying that he would call in the morning; that Robert did not call next morning, having suddenly gone to Jacksonville, Florida, as he had done several times before; and that on the night of the Thursday before Robert's death, while Rufus and his wife were visiting at Robert's home, Robert had said three or four times that he was going to turn his —— —— toes up. Witness identified the gun in evidence as his brother's, and testified that his brother usually kept it in a rag, such as the one in evidence, in the glove compartment of his car; that his brother was in the habit of calling his gun "Dummy", and would speak of himself and his gun as "me and Dummy". He identified the first of the two telephone numbers on the pencilled note as that of appellant's mother, and the second as his own. He testified that about 6:45 on the evening of January 25 appellant had telephoned him concerning his brother Robert, but that they had taken no action then. As he put it: "We didn't know what to do. Miss Clara said he had had so many little 'run-offs' and come back sorta like a cup boiling over".

Miss Ruby Tilley, who in January, 1954, was operating a restaurant at Travelers Rest, testified that she had known Mr. Robert Long for some fourteen years, and that he occasionally came into her restaurant. She said that on Friday morning, January 22, 1954, Mr. Long, accompanied by his eldest child, a boy about fourteen years of age, had come

into the restaurant carrying an unopened half-pint of whiskey and invited her to have a drink with him; and, upon her declining, "he said, I might never have another chance to take a drink with him". He seemed nervous and upset, and acted "more or less like he was kinda scared"; and then: "He asked the little boy to come over and the little boy came over and I thought it was a pistol he taken out of his pocket and his daddy taken it and put it in his pocket; and I kidded him and he put it in his pocket and drank some coffee. He had the whiskey and didn't drink it". And further:

"Q. And he had this pistol at that time? A. Yes, sir.

"Q. And put it in his own pocket? A. Yes, sir".

The single issue before us is whether or not all of the evidence, hereinbefore rather fully summarized, considered in a light most favorable to the appellant's case, is susceptible of any reasonable inference other than that Robert A. Long committed suicide.

When death by violent injury has occurred, unexplained, the presumption is against suicide; but such presumption is nothing more or less than recognition of the abnormality of suicide. It is not evidence, and therefore does not of itself require submission of the issue to the jury when the only reasonable inference from all of the evidence is that the deceased took his own life. *Cf. McMillan v. General American Life Ins. Co.,* 194 S. C. 146, 9 S. E. (2d) 562, and *Johnson v. Atlantic Coast Line R. Co.,* 217 S. C. 190, 60 S. E. (2d) 226. It must be borne in mind, too, that in the case at bar it was conceded that respondent had paid the face of the policy, and that the issue was as to its liability under the "double indemnity" provision for accidental death; that therefore the burden was upon appellant to show that the condition precedent to such liability, i. e., death by accident, had occurred; and that although at the outset proof of death by violent injury, without more, may have sufficed to shift to respondent the burden of offering credible evidence to the contrary, nevertheless when such

evidence had been offered the burden of persuasion, as distinguished from the burden of going forward with the evidence, rested upon appellant to bring herself within the double indemnity provision. *Jefferson Standard Life Ins. Co. v. Clemmer,* 4 Cir., 79 F. (2d) 724, 103 A. L. R. 171.

Careful examination of the record here reveals no substantial evidence for the plaintiff in support of the initial presumption before mentioned. Her counsel argue that the course of the bullet as testified to by Dr. Converse was evidence that the fatal shot could not have been fired by the deceased because he was right-handed. There was no testimony to that effect, nor was such testimony sought to be elicited from Dr. Converse or any other witness; and in our view the physical facts are not of themselves substantial evidence of appellant's contention. There is nothing in the record suggesting any reason for murder, and appellant's theory that the deceased had been murdered in North Carolina and later driven by the murderer or an accomplice to the place where his car was found has no support in the evidence. On the other hand, the conduct and statements of the deceased shortly prior to his death clearly showed a suicidal tendency; and that he took his own life is further evidenced by the obvious fact that his pistol must have been held in the oily rag and against his body at the time of firing to result in powder burning both the rag and his skin by the discharge of a single cartridge. Moreover, his habit of personifying his pistol as "Dummy" furnishes a clue to the reference in the pencilled note to "Deaf and Dum".

Appellant's own testimony, considered in its entirety, is susceptible of no reasonable inference other than that she herself considered her husband as somewhat unstable mentally, and we find in it, as did the trial judge, nothing of such substantiality on the question of suicide *vel non* as would have warranted submission of that issue to the jury. We agree with the circuit judge that all of the evidence, considered together, points, as conclusively as is generally

possible in such cases, to suicide, and that no other inference could reasonably have been drawn from it.

Affirmed.

STUKES, TAYLOR and OXNER, JJ., and J. WOODROW LEWIS, Acting Associate Justice, concur.