**PILOT LIFE INSURANCE COMPANY, Appellant,**

v.

**Jimmie Fay Butler BOONE, Appellee.**

**No. 15916.**

United States Court of Appeals
Fifth Circuit.

Aug. 27, 1956.

---

Ralph B. Tate, R. Foster Etheredge, Birmingham, Ala., C. R. Wharton, Greensboro, N. C., Wharton & Wharton, Greensboro, N. C., Spain, Gillon & Young, Birmingham, Ala., of counsel, for appellant.

William Conway, Leigh M. Clark, Birmingham, Ala., for appellee.

Before HUTCHESON, Chief Judge, and RIVES and BROWN, Circuit Judges.

RIVES, Circuit Judge.

This appeal is from a judgment for $20,000 entered upon the verdict of a jury in a suit on two policies whereby appellant insured the life of appellee's husband, Captain Harry C. Boone. The sole issue was whether Captain Boone committed suicide.

Each of the policies was in the amount of $10,000; they were issued respectively on May 22, 1953 and October 1, 1954; each contained the following provision:

"7. Suicide.—If the Insured shall commit suicide, while sane or insane, within two years from the date hereof, this Policy shall be null and void, except for an amount equal to the sum of the premium paid hereon less any indebtedness hereon."

The date of the death of the insured was November 10, 1954, within two years from the date of each policy.

About three o'clock in the afternoon of the date of Captain Boone's death, a South Carolina Highway Patrolman observed an automobile parked on an old roadbed to the side of Highway 76 about three-quarters of a mile outside of the city limits of Columbia, South Carolina. He stopped to investigate because there had been complaints of people dumping trash and rubbish at that place.

The keys were still in the car. On the front seat was an Army hat or cap. In the open glove compartment was an Army duty belt and a pistol holster of which the flap was open. The officer stepped up on an embankment and took several steps over into the adjacent woods before observing a man's foot and leg some sixty feet further on. When the officer got within two or three yards of the man's foot, he could see the entire body and "knew from looking at him that he was dead." He immediately returned to his patrol car from which he radioed the Highway Patrol Station to notify the Sheriff and the Coroner. In turn those officials notified the Criminal Investigation Department of the Army. The Sheriff, Coroner and several Army officers went immediately to the scene.

They found a pistol wound in the right temple just above the right ear with the exit wound in the left temple just forward of the left ear. The body was lying on its back, with the right leg folded under, left arm stretched outward and right arm out and down toward his right knee and leg. By his right foot was an Army .45 calibre automatic pistol "cocked and ready to fire with one bullet in the barrel in the chamber."

A careful inspection of the surrounding area disclosed no evidence of anyone other than Captain Boone having come into those woods. There were only two partial footprints which were on an embankment several feet from his body. There was no sign of a scuffle. No blood was found at any place except near the body and spattered on the foliage to the left of the body. The Coroner testified that the wound appeared to have been made by a .45 calibre pistol. He had received a report by telephone from a Captain Peach that the only fingerprints found on the pistol were those of Captain Boone. Such hearsay testimony was the only evidence of this important circumstance. Perhaps from oversight, there was no proof as to whether the pistol had been recently fired. Assuming that it had been, the shell of the discharged cartridge could not be located by a thorough search, though this could be explained by the fact that the body was near a deep ravine into which the empty cartridge shell may have been thrown when the pistol discharged.

Captain Boone was a regular Army Officer stationed at Fort Jackson, Columbia, South Carolina, where he lived with his wife and their four children. On the morning of November 10, 1954, he got up around 6 o'clock, dressed, drank a glass of milk, and he and Captain Niforth, a friend, left in Boone's car for Fort Jackson; he worked that morning in the same office (separated by a parti-

tion) with Niforth; around 10 A.M. he saw his immediate superior, Colonel Bone, and asked and received permission to have the remainder of the day off "to take care of some personal business"; Niforth saw him leave the office around 10:20 and at that time he said he was leaving early "to take care of some personal business"; somewhere in the neighborhood of 10 A.M. Captain Boone went to the Supply Room of Headquarters Company, 101st Division, and asked the Supply Clerk, James M. Edney, if they had any weapons and was told that they had carbines and .45 pistols; Boone said he would like to check out a .45; the Supply Clerk went for a .45, a holster and a pistol belt and returned and asked Boone if that was what he wanted; he said, "Yes"; the Clerk inquired if he wanted the pistol temporarily or for a long time and Boone replied that he would have it back the next day but on being reminded that the next day was a holiday (Armistice) and that the supply room would be closed, Boone replied that he would bring it back the following morning; before leaving Boone asked the Clerk if they had any ammunition and he was told that they did not have any but that he might be able to get some from an M.P. Company; he signed for the unloaded pistol, holster and belt; between approximately 10:30 and 10:45 Captain Boone went to the office of Captain Wolfe, the Regimental Adjutant, and went into the Colonel's office, greeted the Colonel and the Executive Officer, remained there for a few minutes and then came out to Captain Wolfe's desk and asked Wolfe if he had any .45 calibre ammunition, saying, "I am going to pick up a payroll"—the testimony is undisputed that on November 10, 1954, Captain Boone had nothing whatsoever to do with picking up a payroll, but on the contrary from around 10:00 A.M. he had Colonel Bone's permission to be off duty and leave the post. It was not part of Captain Boone's duties to handle any part of the payroll at any time; Wolfe had some .45 calibre ammunition and gave Boone approximately five rounds;

when Wolfe handed the ammunition to Boone, Boone said: "I will bring this back this afternoon", but Wolfe replied that it didn't matter as he, Wolfe, was not charged with the ammunition. From then on, the whereabouts of Captain Boone are unknown. Around 3:10 P.M. on that same day (November 10, 1954), South Carolina Highway Patrolman O. L. Derrick found Captain Boone's body.

No suicide note was discovered, nor was there any evidence of declarations of intention to commit suicide. To the contrary, Captain Boone appeared to be happy in his work and in his family life. He was in good health, and in four years would be entitled to retirement privileges from the Army. He was of a "happy-go-lucky, very carefree" disposition and a devoted husband and father. He had a base pay of $580 per month. The only evidence of any motive for suicide came in a deposition of the Sheriff in answer to a question to which the district court sustained objection, probably because of the form of the question, "Did you find any evidence whatsoever of any foul play?" The answer was in the negative, and the Sheriff continued to testify that he found in Captain Boone's automobile,

> "It was two letters there—one addressed to Captain Boone from an oil company that they were going to —that they wanted him to bring his courtesy card in—he was owing a bunch of money; and another one where he had been turned down by some concern in Texas. He wanted to get an additional loan there and they turned him down."

While, as has been stated, that testimony was not legally introduced into evidence, the appellee widow testified:

> "Q. Mrs. Boone, I will just ask you a few questions only in reference to a letter or some letters. You heard somebody testify about some letters in the car or some testimony from one of the deponents, something about a letter from some Oil

Company about a credit card. Did you ever get that letter? A. No, sir, I never did.

"Q. Or something about a loan to a Finance Company or Federal Service Finance Company, a letter, did you get that letter? A. Yes, sir.

"Q. That was in his belongings that was sent back to you after the officers had custody of it? A. Yes, sir."

The widow further testified that on the night before his death, just before going to a meeting of a fraternal order, Captain Boone had $60 on his person with which he told her that he was going to pay some bills the next day. The bills were not paid by Captain Boone, but were later paid by his widow. Only ninety-nine cents was found on his person after his death. The widow was cross-examined as to whether she had not made a statement to Mrs. Niforth on the morning of or after Captain Boone's death,

"Q. I will ask you to refresh your recollection, Mrs. Boone, did you not tell Mrs. Niforth after Captain Boone's death on the morning of his death that he had six dollars and that he had given you five dollars and that later when his body, when his personal effects were returned to you, that there was returned to you the sum of approximately 97 cents. Did you state that to Mrs. Niforth? A. I don't remember anything like that."

Mrs. Niforth was not produced as a witness.

The evidence was thus not fully developed as to several important circumstances, e. g. whether the pistol borrowed by Captain Boone had been fired; wheth-er the pistol bore only Captain Boone's fingerprints; what became of three of the cartridges given him by Captain Wolfe; whether the letters indicating that Captain Boone was badly in debt actually existed; whether the testimony of the appellee as to the missing $60.00 was subject to contradiction or impeachment.

■ Because further evidence may be available on these and perhaps other matters, and because, in any event, the judgment must be reversed for errors of the district court in its instructions to the jury to be hereafter discussed, we think that the interests of justice can best be served by foregoing for the present a decision of the question of whether the appellant, defendant, on the evidence adduced at this trial, was entitled to a directed verdict or to judgment n. o. v., and, instead, remanding the cause for a new trial,[1] in the light of the principles here laid down, and a determination on the evidence then adduced as to whether a verdict should be directed or the case sent to the jury.

■ At a pre-trial hearing it was "stipulated that the application for each policy was made in the State of South Carolina and that each policy was delivered to the insured in said State." The death occurred in South Carolina, and most of the witnesses resided there. Nevertheless, the district court denied appellant's motion made pursuant to 28 U.S.C.A. § 1404(a)[2] to transfer this case to the South Carolina district. The action had been brought where the insured had maintained his legal residence and where the appellee, plaintiff, still resided. There is no indication that the district court failed to give due consideration to the convenience of the parties and witnesses and the interest of justice as required by the statute, and we cannot say that it abused its discretion in denying

---

1. See Gulf Oil Corporation v. Wright, 5 Cir., 236 F.2d 46; M. M. Landy, Inc., v. Nicholas, 5 Cir., 221 F.2d 923, 932; Associates Discount Corp. v. United States, 5 Cir., 200 F.2d 537, 538; City of Fort Worth, Texas v. United States, 5 Cir., 188 F.2d 217, 223.

2. "§ 1404. *Change of venue*

"(a) For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."

the motion for transfer. See Charles Pfizer & Co. v. Olin Mathieson Chemical Corp., 5 Cir., 225 F.2d 718, 720, and cases there cited.

■ Section 1404(a) vests a wide discretion in the district court which should not be exercised originally by this Court. See Schoen v. Mountain Producers Corporation, 3 Cir., 170 F.2d 707, 714, 5 A.L.R.2d 1226. In view of our holdings hereinafter as to the applicability of South Carolina law, the district court may desire to review its denial of a transfer of the action, but we do not mean to intimate that that ruling should or should not be different. As stated, the discretion is confided in the district court.

■ This action being based on life insurance policies with clauses excepting suicide from coverage, the burden of proof rested on the defendant insurer to show that the death came within the exception. Scales v. Prudential Ins. Co. of America, 5 Cir., 109 F.2d 119, 121; Fleetwood v. Pacific Mut. Life Ins. Co., 246 Ala. 571, 21 So.2d 696, 698, 159 A.L.R. 171; 9 Wigmore on Evidence, 3rd ed., § 2510(b), p. 396. On this question of the first burden of proof in the sense of the risk of non persuasion, we are not advised of any difference between the rules prevailing in Alabama and in South Carolina. The rules as to the effect of the presumption against suicide, however, do differ in the two States. In Alabama the presumption is evidential and does not spend its force "until the evidence is sufficient in the judgment of the jury to overcome it." Mutual Life Insurance Co. v. Maddox, 221 Ala. 292, 128

So. 383; New York Life Insurance Co. v. Beason, 229 Ala. 140, 155 So. 530. In South Carolina the presumption does not have the force and effect of evidence, but is an administrative rule of law operating to require the production of credible evidence of self-destruction, after which the presumption disappears. McMillan v. General American Life Insurance Co., 194 S.C. 146, 9 S.E.2d 562; Long v. Metropolitan Life Insurance Co., 228 S.C. 498, 90 S.E.2d 915; Jefferson Standard Life Insurance Co. v. Clemmer, 4 Cir., 79 F.2d 724; Annotation 103 A. L.R. 185; 20 Am.Jur., Evidence, § 220; 31 C.J.S., Evidence, § 135b. The appellant objected to the charge of the court made in accordance with the Alabama rule.[3]

■■ The policies having been applied for and having issued in South Carolina, and the death having occurred in South Carolina, the substantive right of recovery is governed by the law of South Carolina. While many cases can be found to the effect that ordinary presumptions are procedural and governed by the lex fori, we think that it would be a misnomer to bring this presumption against suicide within that class. Indeed, the Alabama Supreme Court in Mutual Life Insurance Co. of New York v. Maddox, 221 Ala. 292, 128 So. 383, 385, characterized this presumption as substantive: "We think this presumption of innocence is a substantive right and not merely a technical incident of the trial wrought for administrative purposes, * * *." The effect of this presumption against suicide is so inseparably connected with the substantive right to defend under the applicable pol-

3. "Now those being the circumstances and those being the undisputed facts on the case, there comes into operation a rule of common sense, a rule of experience, a rule which judges as men have declared out of the wealth of their observation and experience to be the common experience of mankind, and that is to say a presumption of law, that a sane man will not take his own life. Through the centuries it has been the experience of

men that a normal man loves life and abhors death. I am sure that no Judge needs to tell you that as a layman, because that is your own feeling and experience and observation.

"So you have a right in arriving at your verdict and in considering the circumstances to take into account the presumption which the law raises that a sane man will not take his own life intentionally."

icy exception, that we think the law of South Carolina should be given effect in preference to the contrary rule prevailing in Alabama. See Central Vermont Ry. Co. v. White, 238 U.S. 507, 512, 35 S.Ct. 865, 59 L.Ed. 1433; Cities Service Oil Co. v. Dunlap, 308 U.S. 208, 212, 60 S.Ct. 201, 84 L.Ed. 196; Lykes Bros. SS Co. v. Esteves, 5 Cir., 89 F.2d 528, 530; Ellis v. Henderson, 5 Cir., 204 F.2d 173, 175; Weaver v. Alabama Great Southern R. Co., 200 Ala. 432, 76 So. 364, 367; 11 Am.Jur., Conflict of Laws, § 203, p. 523; 15 C.J.S., Conflict of Laws, § 22i, p. 955, Note 70.

▇ In our opinion, the district court further erred in charging the jury that evidence of motive or the lack thereof was of major importance to which must be subordinated the other circumstantial evidence.[4] In giving that instruction the court relied upon the case of Pacific Mutual Life Insurance Co. v. Yeldell, 36 Ala. App. 652, 62 So.2d 805. The pertinent statement in that opinion seems to us to be no more than a paragraph quoted from C.J.S. without express approval, and not necessary for the decision of that case. Certainly, the charge based on the Yeldell case, supra, unless entirely sound, should not control the disposition of a cause of action governed by South Carolina law.

▇ The better rule, we think, was stated by this Court in New York Life Isurance Company v. Trimble, 69 F.2d 849, 851:

" * * * A motive for suicide is helpful to the defense but is not essential. Aetna Life Ins. Co. v. Tooley, supra, 5 Cir., 16 F.2d 243; Burkett v. New York Life Ins. Co., 5 Cir., 56 F.2d 105. This is so because in this life men who have no apparent motive for it do commit suicide. Perhaps always in the case of a sane person who commits suicide there is a motive; but in many cases the motive is not and possibly could not be proven. And so here we leave out of consideration any question of motive for suicide, and assume there was none. In our opinion the circumstances in this case are all consistent with the theory of suicide, and are all inconsistent with any but a fanciful theory of accident."

Again, in Franklin Life Insurance Co. v. Heitchew, 146 F.2d 71, 73, 74, this Court said: "It is, however, true that suicides do occur without a provable motive, and that motive or its absence is only a circumstance to be considered."

The other claimed errors in the court's charge and in the overruling of objections to argument of appellee's counsel probably will not recur on another trial.

For the errors indicated, the judgment is reversed and the cause remanded.

Reversed and remanded.

---

**4.** "Then there is another matter which you have a right to consider and should consider. It is a matter of major importance in deciding how Captain Boone met his death in this case, and this is to say that if there is no direct evidence of eye-witnesses, if there are no suicide notes, if there are no previous declarations of intention to commit suicide, if all of the evidence relating to the manner of death is purely circumstantial, then the matter of motive becomes a matter of major importance in the case. That is to say if you are unable to find in the case facts from which you may infer that Captain Boone had a motive intentionally to take his own life,—and I digress just a moment to say that when I speak of inferences from evidence, I mean inferences logically and sensibly based on the evidence in the case and not conjecture or wild guesses which are not derived from a fair and sensible consideration of the facts. If you are not able to find in the facts or the inferences derived from the facts that Captain Boone had a motive intentionally to take his own life; then I charge you that it is the law that the physical surroundings of the scene and the place of his death must be subordinated in your deliberations to evidence as to motive."