TWENTIETH CENTURY-FOX FILM CORPORATION, Appellant,

v.

Paul C. TEAS et al., Appellees.

No. 18245.

United States Court of Appeals Fifth Circuit.

Jan. 23, 1961.

Rehearing Denied Feb. 21, 1961.

Neth L. Leachman, Dallas, Tex., Kenneth C. Royall, New York City, Irving M. Walker, Los Angeles, Cal., William F. Koegel, New York City, Howard I. Friedman, Los Angeles, Cal., of counsel, for appellant.

Gillis A. Johnson, Ira Butler, Charles L. Stephens, Jack C. Wessler, Fort Worth, Tex., for appellees.

Before TUTTLE, Chief Judge, and RIVES and JONES, Circuit Judges.

TUTTLE, Chief Judge.

This is an appeal from a judgment of the District Court, sitting without a jury, permitting recovery of an amount measured by payments denominated "variable participating royalties" on the finding that such payments were in reality a bonus paid as consideration for the making of an oil and gas lease.

The facts essential to a decision of this case can be rather briefly stated, although they must be culled from a long and involved record and from nearly 600 pages of briefs.

In 1943, Fox Realty Company was a wholly owned subsidiary of the defendant, Twentieth Century. It was the owner of two tracts of land in Los Angeles County, California, which had been acquired, and had long been used, as a site for motion picture studios. It was also the owner of all minerals thereunder subject to restrictions in favor of its predecessors in title prohibiting the drilling for oil and gas. In April 1943, Fox Realty acquired a third tract in fee simple without restriction as to drilling, and without reservation of any interest in the minerals. The prior owner of the two tracts and the owner of the third tract were interrelated and were the predecessors in title to plaintiffs here. As a group, they will hereafter be called plaintiffs.

In the acquisition of the third tract Fox or Twentieth Century paid $491,-419.50 for the 89.349 acres involved and it and defendant Twentieth Century jointly and severally contracted with plaintiffs to pay the former owners of the two lots and to pay the owner of the third lot then being acquired with respect to each lot: [1]

"* * * an amount equivalent to eight and one-third per cent (8⅓%) of the proceeds of all oil, gas, other hydrocarbons and other associated substances produced and saved from wells bottomed under [Lots 1, 2 and 3] without deducting for charges of any kind whatsoever, and * * * an amount equivalent to fifty per cent (50%) of any bonus payment or payments of land rentals (distinguished from payments of oil and gas royalties as the term 'royalties' is generally understood and defined in connection with the construction thereof in oil and gas leases) paid as consideration for making and entering into any lease for the extraction of oil, gas, other hydrocarbons and other associated substances from wells bottomed under said [Lots 1, 2 and 3] * * *."

---

1. The contract, without indicating the inter-company arrangements leading to it was between plaintiffs on the one hand and Twentieth Century and Fox on the other. It provided that the third lot and the releases on the other lot were to be conveyed to Fox in return for a promise, jointly and severally made, by Twentieth and Fox to pay the $491,419.50 and the 8⅓% and other items quoted in the text.

Thereafter, in 1952 Fox entered into an oil and gas lease as lessor with Universal Consolidated Oil Company. That lease provided for the payment by Universal directly to Plaintiffs of the 8⅓% amount on all three lots. In addition, Fox received for itself a royalty of 11⅔% (together with the 8⅓% to be paid directly to plaintiffs this would, of course, amount to payment by Universal of a 20% basic royalty) and it also received what was denominated a "variable participating royalty", consisting of one-half of Universal's net profits from the lease, as defined therein.

We defer consideration of questions of jurisdiction, including that relating to the parties, because the jurisdiction issue will be better understood after we analyze the nature of the contracts. The principal consideration on the merits presented by the suit is whether the full 20% royalties and the "variable participating royalties" were either bonus payments or land rentals. If so, the plaintiffs were entitled to one-half of these sums rather than an amount equal to only 8⅓% of production, which is all that they have received since the execution of the lease.

The respective contentions can be stated quite simply: Plaintiffs contend that the contract guaranteed them 8⅓% basic royalty if there was any oil or gas production and that in addition if Fox obtained anything more than 16⅔% royalties, all such excess represented either bonus or land rentals and they became entitled to one-half of them as well; in the alternative, they claimed that they were entitled to all the excess that would not fit into the recognized definition of royalty, in which case they were entitled to receive one-half of the "variable participating royalties", or net profits, if not also one-half of the 3½% of excess royalties.

The defendant contends that all the plaintiffs were entitled to receive beyond the 8⅓% was any payments that fit into the definition of either "bonus" or "land rental" and that the California jurisprudence excluded net profits and the 3⅓% excess royalties from either

definition, and thus, plaintiffs were entitled to nothing more than the 8⅓% which they had been receiving.

The plaintiffs made a third contention which, in effect, is that in surrendering the restrictions on drilling as to the two lots and in conveying the fee simple without restrictions to the third in return for the 1943 agreements, there was imposed on Fox and, vicariously, on Twentieth Century, the quasi-fiduciary duty to make the best lease agreement it could for the joint protection of itself and of plaintiffs. This, plaintiffs say, required them to obtain as good a "bonus" as possible; it precluded the making of a lease that so divided the total fruits of the leasing as to give much greater benefits to Fox by simply avoiding the inclusion of anything called "bonus" but by including something equally valuable in the nature of added royalties or contingent income in a form of a participation in net operating income. The language of the contract so clearly distinguishes royalty from any other kind of benefits to be realized from a lease of the minerals, we conclude that it is clear that there could be no violation of the defendant's alleged duty to act in good faith if it was able, as happened here, to exact an additional amount clearly recognized to be royalties. The disposition we make of the case as to the remaining payments makes it unnecessary for us to determine whether the fiduciary or good faith contention should prevail as to the variable participating royalties.

Restating the issue, we must decide whether the excess of 3⅓% (20% over twice 8⅓%) and the one-half of the net profits of the operation are "bonus payments" or "land rentals," "distinguished from the term 'royalty' as the term 'royalties' is generally understood in connection with the construction thereof in oil and gas leases."

The trial court, after making extensive findings of fact, concluded that both categories of payments satisfied the definition of "bonus" and decreed that the plaintiffs were entitled to participate fifty-fifty with defendant as to all pay-

ments from the Universal Consolidated lease.

■ We consider the simple part of the question first. There can really be no serious doubt that the entire 11⅔% royalties received by Fox (in addition to the 8⅓% paid by lessee to plaintiffs direct) was "payment of oil and gas royalties as the term 'royalties' is generally understood and defined, etc.", except for one implausible and strained contention. That is, that at the time in question in California the customary *rate* of royalty was 16⅔%; therefore, the term "royalties, generally understood and defined in connection with the construction thereof in oil and gas leases" must mean that anything in excess of 16⅔% is excluded. To the contrary, we think the parenthetical part of the contract intends only to define the *quality* of a royalty and not the *quantity*. We think it clear as to royalties, in the accepted sense, the plaintiffs agreed to a figure of 8⅓%. Anything defendant was able to bargain for as royalties beyond that figure it was not obligated to share with plaintiffs. To this extent, therefore, the judgment of the trial court was in error.

■ Turning then to the second and more difficult issue: was the one-half of the net profits from the operation a bonus as distinguished from the payment of royalties? We conclude that on this issue the plaintiffs are correct in their contention, and to that very substantial extent we affirm what was decided by the trial court.

Much of the argument in the extensive briefs filed by the parties is devoted to the discussion of the degree to which it was proper for the trial court to hear evidence of the circumstances surrounding the execution of the 1943 contract and concerning the meaning in the trade of the several terms "bonus", "land rentals", and "royalty". Most courts, and this one is no exception, have had considerable difficulty in formulating any definitive rule that adequately covers that area of the law of evidence. The members of this Court are not, among themselves, always in agreement in the particular application of the generally accepted rules. See Fidelity-Phenix Fire Insurance Company v. Farm Air Service, Inc., 5 Cir., 255 F.2d 658; Gulf Atlantic Towing Corp. v. Dickerson, Inc., 5 Cir., 271 F.2d 542; and see discussion in footnote 14 of United States Industries v. Camco, Inc., 5 Cir., 277 F.2d 292, 295.

■ Whatever may be the proper rule respecting the introduction of external evidence to aid the court in construing a written contract, we do not need to concern ourselves with that problem here, because we think it plain that this contract, by its very terms, required reference to such external evidence. The only "bonus" or "land rentals" payments in which the plaintiffs are entitled to participate are such as are distinguished from royalties, and the parties agreed that in ascertaining what was meant by royalties they would ascertain what is understood and defined as royalties in the construction of such terms in oil and gas leases. When it became the duty of the trial court to make this ascertainment, it was required, we think, to obtain evidence from those familiar with the terms as used in the trade.

Appellant contends that rather than importing the use of external evidence, this language required the trial court to refer to California decided cases,[2] which it says define "bonus", "land rentals", and "royalty" in legal terms that preclude a decision in favor of the appellants.

The appellees take the position, on the contrary, that this parenthetical clause of the contract does not refer the inquiry to decided cases, but rather to the understanding of the trade, and moreover they say that if the matter be referable to judicial decisions alone, there are no California decisions holding that the two categories of payments here are neither bonus or land rentals.

As we have already indicated, we conclude that there is no question here of

2. It is not disputed that California law governs in the construction of the contract.

varying the contract by parole evidence, because the contract itself makes the definition of the term "royalty" referable to understanding in the trade, and this is, of course, provable only by parole evidence.

While we conclude that this matter of definition is to be ascertained as a question of fact, based upon the understanding and definition of "royalty" in the construction of oil and gas leases in California, we feel it appropriate to discuss briefly the argument by appellant touching on the California jurisprudence dealing with the various definitions. The principal case cited by appellant in support of its contention is Geller v. Smith, 130 Cal.App. 485, 20 P.2d 102, 104, a case decided in 1933. The trial court in that case was concerned with a suit by a real estate agent under a contract which entitled the agent to any "bonus" received by his principal in executing a lease. The parties to the lease denominated part of a $2,000 cash payment, a "bonus" and $1500 a "commission." The trial court held that the $1500 was a bonus notwithstanding the parties called it a "commission." In doing so, the court said:

"Apparently it all hinges on the meaning of the word, 'bonus'. I think the word 'bonus' has a legal meaning, but a certain term may have a significant meaning in a certain business and in a certain locality, and if it varies with the locality, it may be established by evidence. On the other hand, that expression may come to have a definite legal meaning. *My opinion is that the term 'bonus' as applied to an oil lease has come to have a definite meaning, to wit: a sum of money paid by the lessee to the lessor in consideration for the execution of a lease, as distinguished from the return or royalty reserved by the lessor to be paid by the lessee through the term of the lease.*" (This emphasis is used by appellant to indicate what it particularly relies on.)

This statement was approved by the appellate court in affirming the judgment of the trial court.

It at once becomes apparent that in order to decide that the $1500 involved in that case was a "bonus," as contracted for by the parties, it was not necessary for the court to announce a definition of "bonus" *as distinguished* from "royalty." There was no suggestion in that case that the $1500 payment was a "royalty."

Thus, it must be recognized, that in approving this statement, the California Court of Appeals approved what was really dictum. In light of this analysis of Geller v. Smith, supra, we think the later opinion by the California Court of Appeals in Stockton v. Weeks, 51 Cal. App.2d 447, 125 P.2d 110, 112, decided in 1941, is significant. In that case, the court said, "No fixed and unvarying meaning can be applied to the term 'bonus' without a construction of the particular lease in each case."

This apparently was the latest pronouncement of the California Appellate Court touching on the subject at the time the 1943 contract was executed. We think, therefore, that even under these California decisions, the matter of what was meant by "bonus" and "royalty" in a contract phrased as was the one now before the court, had not been judicially determined, as having the meaning ascribed to them by appellant.

We think it clear that there is a dictionary meaning of the word "bonus" that would fully support the plaintiffs' claim, i. e., "something extra".[3] Thus, but for some special meaning in the trade that would make it a word of art, when the contract provided a royalty of 8⅓% and then provided for one-half of any bonus payments, other than royalties it could well be argued that bonus meant anything extra (outside of anything strictly known as royalties) received by the lessor.

---

**3.** Something given in addition to what is usual or strictly due to the recipient.

Webster's New International Dictionary, 1936 edition.

Holding as we do, however, that this particular contract leaves it open to either party to establish that the net income payments meet its claimed definition of royalty or bonus, we turn now to the nature of the proof on which the District Court made its finding of fact.

The precise fact findings by the trial court that support the decision in favor of plaintiffs are:

"19. A 'net profits interest' such as was provided in the 1952 lease of Universal Consolidated Oil Company was not a royalty 'as the term "royalties" is generally understood and defined in connection with the construction thereof in oil and gas leases' either by common usage, Court definitions or according to the intention of the parties when these contracts are made in 1943.

"24. The 'net profits interest' such as was provided in the 1952 lease to Universal Consolidated Oil Company was a 'bonus' under these 1943 contracts."

■ It can hardly be argued that there was a lack of substantial evidence to support these findings. The evidence fully warranted, if, indeed, it did not demand, a finding that royalty as generally understood and defined is (1) an interest in, or measured by (2) gross production, (3) bearing no part of the cost of development, operation or production and (4) continuing from the first production until the last barrel is produced from the property, however these characteristics may be grouped or expressed. The outstanding characteristic, as testified to, seems to be that as every barrel of oil is taken out, the royalty is paid, whether or not the lessee makes a profit.

Thus, it was only logical for the Court to find that the payments here called "variable participating royalty" which are in fact payments representing one-half the *net* profits after the deduction of all operating and development costs, are not payments of royalties as generally understood and defined. They lacked the characteristic of being paid out of every barrel of production and they became due only after all expenses have been met.

In view of the fact that the only kind of payments dealt with in the contract were royalty, bonus and land rental payments, and that the latter two were stated to be distinguished from the other by what the industry understood were the qualities attributed to royalty, a strong argument could be made that all fruits from any leasing were intended to fall within one of these three terms. This is what appellees contend. We need not go that far as a matter of law for us to approve the action of the trial court because its findings gave effect to this contention based on the evidence before it.

The provision in the contract referring the meaning of royalty to external evidence to determine whether the payment of net profits was distinguishable from royalty makes it necessary to refer to external evidence to ascertain the understanding and definition of the contrasted terms bonus and land rentals. Such external evidence clearly supports the finding that the variable participating royalties are bonus payments. The record includes evidence that there was a general custom and usage in the area at the time of the execution of the contract with respect to the meaning and use of the term "bonus" and that the meaning was that "bonus" comprehended every consideration that the lessor received other than royalties; again, the term "bonus" meant "any consideration in addition to the normal or basic royalties that was paid for a lease."

Moreover, as we read the cases cited by appellant to demonstrate its contention that bonus cannot include these variable participating royalties, we find that they do not really support this claim, even though we should recognize them as controlling. Even in the case of Geller v. Smith, quoted above, there the definition relied on by appellant is "a sum of money paid by lessee to the lessor in consideration for the execution of a lease, *as distinguished from the return of royalty reserved by the lessor through*

*the term of the lease."* Once we have approved a finding that the net profits cannot be considered as "royalty", then there is nothing in this definition that would exclude from the definition of "bonus" payments made by the lessee to the lessor as net profits in consideration for the execution of the lease. There is nothing in the language used by the court in Geller v. Smith that the "sum of money" must be either cash or must be exactly ascertained in amount at the time the lessee obligates itself to make the payments.

So, too, the definitions urged on the Court by appellant as stated in Griffith v. Taylor, 156 Tex. 1, 291 S.W.2d 673, 676. In that case, the Supreme Court of Texas quoted the above language of Geller v. Smith defining bonus and also quoted from Texas Company v. Fontenot, 200 La. 753, 8 So.2d 689, stating, "bonus meaning the cash consideration paid or agreed to be paid for the execution of the lease." We do not understand that any of these cases stands for the proposition that the term bonus is not broad enough to comprehend payments made to a lessor, the amount and method of measurement of which payments are fixed by a formula, so long as the formula is not that which constitutes a royalty. We find nothing in the Elsinore Oil Co. v. Signal Oil & Gas Co., 3 Cal.App.2d 570, 40 P.2d 523, case in conflict with what is said here.

We conclude, therefore, on the merits, that this contract is to be construed as entitling the plaintiffs, in addition to the 8⅓% payments to be received directly from the lessee, to receive a sum equal to one-half of the amounts received and to be received by Fox and denominated in the lease contract "variable participating royalties."

Several other matters remain for consideration. The first of these, appellant's contention that the plaintiffs did not have title to the claims sued upon because of a failure to comply with the provisions of the California Blue Sky Laws on assignment of securities we think too insubstantial to require extended comment. Substantially all of the assignments here involved were made to their stockholders upon the legal dissolution of the corporations. As to the others, we think the trial court properly held that valid title to the claims resided in the plaintiffs.

▪ The next point is the combined issue of parties and jurisdiction. Appellant strongly urges that the District Court for the Northern District of Texas did not have jurisdiction over the case for two reasons: (1) It was a suit involving an interest in real property and was thus not a transitory action and only the district court of the situs of the realty had jurisdiction, and (2) Fox Realty Company, a California corporation, as the lessor under the lease here being construed, was an indispensable party to the action by reason of its being a suit over an interest in realty, and if Fox Realty Company were brought into the suit as a defendant diversity jurisdiction would be destroyed because there were several California plaintiffs.

These two contentions are resolved by a single consideration. Fox Realty Company is *not* an indispensable party *because* the action is not one dealing with an interest in realty.[4] We need not consider whether, if Fox Realty were being sued, such suit would deal with an interest in realty by reason of the fact that Fox was the lessor and its reservation of a royalty interest (at least as to 11⅔%, and possibly also the 8⅓% payment) amounted to an interest in realty.[5]

---

4. Appellant pitches its claim on indispensability on the theory that this suit adjudicates rights in real property. Appellees answer that no such real property interests are decided. Both seem to agree that if it were such a suit touching on real property Fox Realty would be an indispensable party.

5. This proposition, the appellant states, is supported by Commissioner of Internal Revenue v. Southwest Exploration Co., 350 U.S. 308, 76 S.Ct. 395, 100 L.Ed. 347 (although all the Court held there was that there was sufficient *economic* interest in the minerals in place in the owners of adjacent lands needed for drilling pur-

Here the defendant was at no time in the chain of title to any of the interests included within the 1943 agreement under which its obligation arose to make the several kinds of payments. As between itself and the plaintiffs, Twentieth Century merely promised that the payments would be made. As we have already discussed, conveyance of the releases and of the fee to the third tract of land was made to Fox on the promise of Fox and Twentieth Century *jointly* and *severally* to pay the consideration. Twentieth Century's obligation thus was strictly a personal obligation, which by its agreement it repeatedly denominated *joint* and *several*. Of course, under a joint and several obligation the obligee can sue either or both obligors. The privilege of suing one without joining the other is a substantial benefit to the obligee which we think cannot be frustrated by holding that the other several obligor must be joined as an indispensable party.

Whatever might be the situation if Twentieth Century's obligation to pay these items to the plaintiffs arose from its having an assignment or conveyance from Fox as a predecessor of title, we do not here need to decide. Here Twentieth Century, so far as concerns any interest that Fox may have in real property, actually stands to one side and its liability to the plaintiff is to be construed solely on its contractual agreement to pay and not on any interrelationship between the parties flowing from a dealing with an interest in real property.

▪ Next, we find no basis for holding that the finding by the trial court that there had been no waiver of rights claimed by the plaintiffs and no estoppel or ratification of them was not supported in the record. These matters are typically factual in nature and findings of fact by the trial court, of course, are not to be overturned unless clearly erroneous.

Finally, the appellant complains of the denial by the trial court of its motion to transfer the case to the Southern District of California for trial under the doctrine *forum non conveniens*, 28 U.S.C.A. § 1404(a). The trial court conducted a full hearing on this motion. Thus the law is as stated by this Court in Pilot Life Ins. Co. v. Boone, 5 Cir., 236 F.2d 457, 461:

> "There is no indication that the District Court failed to give consideration to the convenience of the parties and the witnesses in the interest of justice, as required by the statute, and we cannot see that it abused its discretion in denying the motion for transfer."

The final judgment of the trial court was amply supported as to the construction of the contract touching on the one-half interest in the "variable participating royalty," as to jurisdiction of the court, the plaintiffs' title to the claims, and absence of ratification. The Court did not err in refusing to transfer the suit for the convenience of the parties. The Court erred in holding that the plaintiffs were entitled to participate in the 3⅓% excess royalties.

For the correction of the judgment accordingly, the judgment is Reversed and the case Remanded for further proceedings not inconsistent with this opinion. Costs of this appeal are charged two-thirds to appellees and one-third to appellant.

poses to entitle them to take depletion for federal tax purposes on proceeds from leases of drilling rights). Callahan v. Martin, 3 Cal.2d 110, 43 P.2d 788, 101 A.L.R. 871; La Laguna Ranch Co. v. Dodge, 18 Cal.2d 132, 114 P.2d 351, 353, 135 A.L.R. 546, and County of Los Angeles v. Continental Corp., 113 Cal. App.2d 207, 248 P.2d 157.

Appellees counter principally by pointing to the language of the contract that is in terms of "amounts equivalent to, etc." and they cite In re Broome's Estate, 166 Cal.App.2d 488, 333 P.2d 273.