Virginia J. Barry MELVILLE

v.

AMERICAN HOME ASSURANCE COMPANY, Appellant.

No. 78-1095.

United States Court of Appeals, Third Circuit.

Argued Sept. 8, 1978.

Decided Oct. 5, 1978.

Jerome H. Ellis, Philadelphia, Pa., Kreindler & Kreindler, New York City, for appellee; Melvin I. Friedman, Gerald A. Robbie, Steven J. Phillips, New York City, of counsel.

Sidney L. Wickenhaver, Carol A. Mager, Philadelphia, Pa., for appellant; Montgomery, McCracken, Walker & Rhoads, Philadelphia, Pa., of counsel.

Before GIBBONS, HUNTER and GARTH, Circuit Judges.

## OPINION OF THE COURT

GARTH, Circuit Judge.

This is an appeal by the defendant, American Home Assurance Company ("American"), from a judgment on a jury verdict in favor of the plaintiff, Virginia Barry Melville, in her action to recover the policy amount of $500,000 on an insurance policy covering accidental death. Three issues are before this court for review: (1) whether the district court erred in its choice of law determination that the New York presumption with respect to suicide applied in this case, rather than the presumptions of Pennsylvania or Delaware, (2) if New York law is controlling, whether the district court's instructions concerning that state's presumption against suicide were proper, and (3) whether error was committed in admitting into evidence Airworthiness Directives issued by the Federal Aviation Administration. Because the district court erred in its choice of law, we reverse.

I

The facts of this case are described in great detail in the scholarly opinion of the district court judge, *Melville v. American Home Assurance Co.,* 443 F.Supp. 1064 (E.D.Pa.1977). Hence we refer here to only those facts essential to elucidate our decision.

Melville was the sole beneficiary of an accident insurance policy purchased by the insured, Josiah Marvel Scott. Following the insured's death in an airplane crash which can best be characterized as bizarre, this diversity action was commenced in the federal court in the Eastern District of Pennsylvania to recover the insurance proceeds. A previous action had been commenced in New York state court, but had been dismissed on the ground of forum non conveniens. In the instant action, diversity of citizenship existed because Melville was a citizen of Pennsylvania at the time of suit, and American is a New York corporation with its principal place of business in New York.

The principal defense asserted by American was that Scott, the insured, had committed suicide by intentionally interfering with the pilot's use of the dual controls in the small chartered plane in which he was the sole passenger. The policy excluded coverage when death occurred by reason of suicide.

Scott, the insured, had been a lifelong citizen of Delaware. He had purchased the insurance policy from the Delaware office of Johnson & Higgins, an insurance broker whose main office is in Philadelphia. The broker had placed the order by phone with American, and an oral binder was effected at American's New York office. American subsequently issued the policy and posted it in New York. It was sent to the broker's Philadelphia office, through which it eventually reached Scott in Delaware. Scott met his death in Delaware and Delaware is the locale where most of the facts relevant to the question of accident or suicide occurred.

## II

■ In this diversity action, the district court's choice of law decisions must be governed by the choice of law rules of Pennsylvania, the forum state. *Klaxon Co. v. Stentor Electric Manufacturing Co., Inc.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Because of the nature of the claim and defense in this case, the district court was required to utilize Pennsylvania's conflicts rules in choosing among the Pennsylvania, Delaware, and New York presumptions against suicide. Since the differences in the New York presumption, on the one

hand, and those of Pennsylvania and Delaware, on the other hand, would have a significant effect on the outcome of the trial, a conflict in terms of choice of law was presented.

■ Normally, the beneficiary of an accident insurance policy has the burden of pleading and proving accident. *See Adams v. Metropolitan Life Insurance Company,* 136 Pa.Super. 454, 7 A.2d 544 (1939). However, New York law prescribes a presumption against suicide which imposes on the party contending that violent death was self-inflicted (here American) the burdens of pleading and persuasion as to that contention.[1] Pennsylvania has no such strong presumption against suicide. Pennsylvania law provides that it is merely permissible for the fact-finder to infer, based on common understanding of human nature, that death was not self-inflicted.[2] No Delaware case has addressed itself to the presumption against suicide in suits involving accidental death insurance policies. Following the command of *Klaxon Company v. Stentor Electric Manufacturing Co., Inc.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), the district court properly applied Pennsylvania's conflicts rule that when a sister state's law is unknown or unclear it is presumed to be the same as Pennsylvania's. *In re Trust of Pennington,* 421 Pa. 334, 219 A.2d 353, 356 (1966). For purposes of this case, Delaware's and Pennsylvania's presumptions against suicide were thus viewed as identical.

Turning to Pennsylvania's conflicts rules in order to determine whether Pennsylva-

1. *Wellisch v. John Hancock Mutual Life Insurance Co.,* 293 N.Y. 178, 184, 56 N.E.2d 540, 543 (1944), stated that "[t]he 'presumption against suicide' means that when death by violence is shown and an inference must be drawn by the jury as to suicide or not, then the jury should in good conscience draw the inference of accident, not suicide." This presumption was further explained in *Begley v. Prudential Insurance Company of America,* 1 N.Y.2d 530, 154 N.Y.S.2d 866, 868, 136 N.E.2d 839, 841 (1956), as follows:

> When death has resulted from violence, the presumption against suicide does more than shift the burden of proof and upon having

done so disappears from the case; it continues to the end of the case and if a fair question of fact is presented as to whether death was due to suicide or accident, then the jury should answer accident.

Under McCormick's analysis, this presumption is of the sort which shifts both the burden of production and persuasion to the party contending that death was by suicide. *See* McCormick on Evidence 826 (2d ed. 1972).

2. *Watkins v. Prudential Insurance Company,* 315 Pa. 497, 173 A. 644 (1934); McCormick, *supra* note 1, at 811 n.74.

nia, Delaware, or New York's presumption against suicide properly controlled, the district court concluded that Pennsylvania's conflicts methodology was in disarray as regards contract actions. In an effort to apply accurately Pennsylvania's conflicts decisions, the court proceeded along two discrete lines of inquiry suggested by relevant case law. The district court first examined the traditional rules of the Restatement of Conflict of Laws ("Restatement I") which are grounded on notions of territorial sovereignty. Under either the place of contracting or the place of performance provisions, the district court judge concluded that New York law would govern.[3] He then applied the approach for tort actions which was adopted by the Pennsylvania Supreme Court in *Griffith v. United Air Lines, Inc.*, 416 Pa. 1, 203 A.2d 796 (1964). *Griffith* was read as employing a combination of Professor Currie's "interest analysis"[4] and the Restatement (Second) of Conflict of Laws ("Restatement II") grouping of contacts theory. These two methods were applied seriatim by the court.

The district court judge concluded that neither New York, Pennsylvania, nor Delaware had a significant interest in having its law apply. Professor Currie's suggestion

that in such an "unprovided for case" the law of the forum should be applied on grounds of convenience was rejected, however. Rather, in order to prevent forum shopping, the district court turned to the contacts approach of Restatement II. Analyzing the factors listed in Restatement II § 188, it concluded that New York law should apply since that state was both the place of negotiation, and the place of performance under the policy, as well as the residence of American. The court explicitly eschewed application of Restatement II § 192, which provides that rights created by an insurance contract are generally to be governed by the law of the state where the insured is domiciled, on grounds that the Pennsylvania courts would find that section of Restatement II too inflexible to justify automatic application.

Melville of course attempts to sustain the judgment of the district court, primarily by arguing that Restatement II § 192 is not applicable and that New York has an interest in enforcing the contractual obligations of its own domiciliaries according to New York law even when this would operate to the benefit of a nonresident.[5] Brief for Appellee 16–22.

---

**3.** The principal distinction in Restatement I concerning contracts is between the place of contracting and the place of performance. The place of contracting determines the obligations of any contract. Restatement I § 346. Since the insurance contract was posted from New York, the district court, relying primarily upon Restatement I § 317 (". . . the place of contracting is where the policy is posted"), concluded that New York was the place of contracting and that its presumption against suicide applied insofar as it concerned an obligation under the contract. The district court made no reference to Restatement I § 318, which provides that "[w]hen an *insurance* policy becomes effective upon delivery and is sent by the company to its agent and by him delivered to the assured, the place of contracting is the place where it is thus delivered to the assured." Reference to this latter section might have led to a different conclusion inasmuch as it appears that Delaware, and not New York, was the place of contracting since the policy was delivered to Scott in Delaware by American's Philadelphia agent. Under our analysis, however, we are not required to resolve this issue.

Restatement I § 358 provides that the law of the place of performance governs, *inter alia,* the manner of performance and excuse for non-performance. The district court judge decided that American would complete its performance by posting a check from New York for insurance proceeds. New York was therefore the place of performance. The district court therefore found that New York's presumption against suicide would govern insofar as this presumption affected performance under the contract.

**4.** *See* B. Currie, Selected Essays on the Conflict of Laws (1963); Currie, The Disinterested Third State, 28 L. & Contemp.Probs. 757 (1963).

**5.** In support of the proposition that a state, such as New York, has an interest in enforcing the contractual obligations of its domiciliaries even to the advantage of non-residents, Melville cites *Hurtado v. Superior Court of Sacramento County*, 11 Cal.3d 574, 114 Cal.Rptr. 106, 522 P.2d 666 (1974) (measure of damages for wrongful death in California of Mexican citizen governed by California law); *Johnson v. Hertz Corp.*, 315 F.Supp. 302 (S.D.N.Y.1970) (New York law governing liability of owner for

American advances two main arguments in seeking to reverse the decision of the district court. It first contends that the presumption concerning suicide is purely procedural and, as such, must be determined in accordance with the law of the forum, which in this case is Pennsylvania. In the alternative it argues that Pennsylvania would extend to contract actions the modern conflicts approach found in *Griffith v. United Air Lines, Inc., supra,* and that under such an analysis Delaware's presumption with respect to suicide would govern. We agree with this latter position.

### III

### A

We are of course cognizant of the fact that the conflict of laws rules to be applied in this diversity action are those of the forum. *Klaxon Co. v. Stentor Electric Manufacturing Co., Inc., supra.* However, it appears that Pennsylvania, for purposes of choice of law, has not yet resolved the question of whether the presumption against suicide is one of procedural or substantive law. Although it is generally the case that, under Pennsylvania choice of law rules, matters of burden of proof, presumptions, and sufficiency of evidence to submit the case to the jury are determined by the law of the forum, *see, e. g., Sloniger v. Enterline,* 400 Pa. 457, 162 A.2d 397 (1960); *Dill v. Scuka,* 279 F.2d 145 (3d Cir. 1960), we

agree with the district court's conclusion that the presumption against suicide has sufficient substantive import that it would not be routinely labelled as procedural by the Pennsylvania courts. We recognize that in other contexts the Pennsylvania courts have indicated their approval of the Restatement II, *see Elston v. Industrial Lift Truck Co.,* 420 Pa. 97, 216 A.2d 318 (1966). Such approval indicates to us that Pennsylvania would also approve and subscribe to the provisions of Restatement II §§ 133, 134. Those sections prescribe the use of forum law as to the burden of proof and as to the effect of presumptions "unless the primary purpose of the relevant rule of the state of the otherwise applicable law is to affect the decision of the issue. . . ." In concluding that the presumption against suicide was designed to have such effect, we find support in the decision in *Pilot Life Insurance Co. v. Boone,* 236 F.2d 457 (5th Cir. 1956), which held that the presumption against suicide in a suit on a life insurance policy was a matter of substantive contract law.[6] The court concluded that "the effect of this presumption against suicide is . . . inseparably connected with the substantive right to defend under the applicable policy exception . . . ." *Id.* at 462–63. *Cf. Headen v. Pope & Talbot, Incorporated,* 252 F.2d 739 (3d Cir. 1958) (Pennsylvania, the forum state, marital presumptions applied because they reflect social policy, not because they are procedural).

negligence of driver governs in action by Massachusetts plaintiffs against owner of car registered in New York based on accident which occurred in New Jersey); *Pfau v. Trent Aluminum Co.,* 55 N.J. 511, 263 A.2d 129 (1970) (dicta in false conflicts case that a defendant's domicile may have an interest in holding its domiciliaries to the full measure of damages or standard of care provided by that state's tort law). We find these cases to be inapposite for two reasons. First, at least in *Hurtado* and *Johnson,* the courts explicitly found that, with respect to the tort obligations at issue, the *only* states with any interest in the controversy were the states in which the defendants resided. Here, in contrast, more than one state has an interest. Even if it is conceded that New York has an interest, that interest is nevertheless outweighed by the interest of Delaware in having its law applied to insurance contracts covering its domiciliaries. Second, all of the cases

cited involve tort actions in which a state may have a significant interest in deterring unplanned tortious conduct in order to protect its own citizens. This deterrence interest is not as strong in the case of contract actions because the parties to a contract are more readily able to take into account in advance the law that will govern their contractual disputes.

6. *Weber v. Continental Casualty Co.,* 379 F.2d 729 (10th Cir. 1967), cited by Melville, is not necessarily to the contrary. Although an alternate ground for decision was that Oklahoma would not apply the California presumption of accidental death because it treated rebuttable presumptions as merely procedural, the court noted that the presumption at issue did not closely affect the substantive right to be decided. *Id.* at 732.

## B

■ Since we are of the opinion that Pennsylvania would treat the presumption against suicide as substantive, we must next examine the Pennsylvania conflicts cases to determine which state's presumption it would apply. The threshold task in this analysis is to determine whether the flexible conflicts methodology adopted by the Pennsylvania Supreme Court for tort actions in *Griffith v. United Air Lines, Inc.,* 416 Pa. 1, 203 A.2d 796 (1964), has been extended to contract actions.[7] Although no Pennsylvania case clearly so holds, we think, as explained below, that the evolution of Pennsylvania conflicts decisions ineluctably leads to the conclusion that the *Griffith* approach will be employed in contract actions when the occasion arises.

■ The *Griffith* decision brought Pennsylvania into the modern era of conflicts methodology. In this wrongful death action arising from an airplane crash in Colorado, the Pennsylvania Supreme Court rejected the Restatement I approach—requiring application of the law of the place of the wrong—to which it had earlier adhered and adopted a flexible methodology entailing analysis of the policies and contacts of the various concerned jurisdictions. This methodology combines the approaches of both Restatement II (contacts establishing significant relationships) and "interest analysis" (qualitative appraisal of the relevant States' policies with respect to the controversy). It takes into account both the grouping of contacts with the various concerned jurisdictions and the interests and policies that may be validly asserted by each jurisdiction. Fairly read, *Griffith*, in drawing upon Restatement II's analysis and "interest analysis" may be said to have combined both in the *Griffith* "flexible rule." It is that rule which the *Griffith* court claims "permits analysis of the policies and interests underlying the particular issue before the court." 203 A.2d at 805. *See Kuchinic v. McCrory,* 422 Pa. 620, 222 A.2d 897 (1966). Under Pennsylvania law, it is firmly established that this approach is applicable in tort actions. *See McSwain v.*

7. We agree with the district court that the Third Circuit decisions touching upon Pennsylvania's conflicts rules provide little guidance on this issue. Perhaps more than anything else they represent the dangers of dicta, for in virtually all of those cases the parties were agreed as to the governing law and no conflicts question was put in issue.

For this circuit's cases suggesting that Restatement I rather than *Griffith* governs in contract actions, *see Jamison v. Miracle Mile Rambler, Inc.,* 536 F.2d 560, 562 (3d Cir. 1976); *William B. Tanner Co., Inc. v. WIOO, Inc.,* 528 F.2d 262 (3d Cir. 1975); *Craftmark Home, Inc. v. Nanticoke Construction Co.,* 526 F.2d 790, 792 n.2 (3d Cir. 1975); *Daburlos v. Commercial Insurance Co.,* 521 F.2d 18, 20 n.2 (3d Cir. 1975); *Pittsburgh Bridge and Iron Works v. Liberty Mutual Insurance Co.,* 444 F.2d 1268, 1288 n.2 (3d Cir. 1971); *Boase v. Lee Rubber and Tire Corp.,* 437 F.2d 527, 529–30 (3d Cir. 1971); *First Pennsylvania Banking and Trust Co. v. U. S. Life Insurance Co.,* 421 F.2d 959, 962 (3d Cir. 1969).

Of these, the only significant discussion of the issue is contained in *Boase v. Lee Rubber and Tire Corp.,* 437 F.2d 527, 529–30 (3d Cir. 1971). For two reasons, however, we believe this case no longer provides an authoritative statement as to Pennsylvania conflicts law. First, it was decided before the Superior Court's decision in *Gillan v. Gillan,* 236 Pa.Super. 147, 345 A.2d 742 (1975), *see* discussion pp. —— – —— *infra,* which establishes to our satisfaction that *Griffith* has been extended to contract actions. Second, the issue before the court in *Boase* was not formally one of choice of law, but rather concerned the validity of a contractual choice of law provision.

For cases indicating that *Griffith* has been extended to contract actions, *see Kademos v. Equitable Life Assurance Society,* 513 F.2d 1073, 1075 (3d Cir. 1975); *Siata International U.S.A., Inc. v. Insurance Company of North America,* 498 F.2d 817, 820 (3d Cir. 1974); *Travelers Insurance Co. v. Davis,* 490 F.2d 536, 542–43 (3d Cir. 1974); *Neville Chemical Co. v. Union Carbide Corp.,* 422 F.2d 1205, 1210–11 (3d Cir.), *cert. denied,* 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55 (1970); *Slaughter v. Philadelphia National Bank,* 417 F.2d 21, 26 n.8 (3d Cir. 1969); *Scott v. Eastern Airline, Inc.,* 399 F.2d 14, 22–23 (3d Cir.) (en banc), *cert. denied,* 393 U.S. 979, 89 S.Ct. 446, 21 L.Ed.2d 439 (1968); *Mannke v. Benjamin Moore & Co.,* 375 F.2d 281, 283 (3d Cir. 1967).

These cases largely assumed that *Griffith,* once decided, had effectuated a change in Pennsylvania's conflicts methodology with respect to all types of actions. If their conclusion was premature, we believe it has since been borne out by the Superior Court's decision in *Gillan.*

*McSwain,* 420 Pa. 86, 215 A.2d 677 (1966) (inter-spousal tort immunity); *Elston v. Industrial Lift Truck Co.,* 420 Pa. 97, 216 A.2d 318 (1966) (third-party contribution); *Kuchinic v. McCrory, supra* (guest statute); *Cipolla v. Shaposka,* 439 Pa. 563, 267 A.2d 854 (1970) (guest statute).

The Pennsylvania courts at first equivocated as to whether *Griffith* would be applied in contract actions. In *Eastcoast Equipment Co. v. Maryland Casualty Co.,* 207 Pa.Super. 383, 218 A.2d 91 (1966), an action to recover attorneys' fees incurred when the insurer refused to defend two personal injury actions as required by the policy, the Pennsylvania Superior Court stated that the Restatement I methodology was applicable in contract actions and that *Griffith* was limited to tort actions.[8] 218 A.2d 95 n.5. It appears, however, that no choice of law issue had been raised by the parties since the insurer, who stood to benefit from the application of another state's law, had argued on appeal the law of the place of contracting (Pennsylvania) controlled and should be applied.

Subsequent to *Eastcoast Equipment,* the Pennsylvania Supreme Court then decided *In re Hunter,* 421 Pa. 287, 218 A.2d 764 (1966), holding that Pennsylvania law governed the validity of child relinquishment forms even though they had been executed in West Virginia. Justice Roberts, the author of the *Griffith* opinion cited *Griffith* and the Restatement II in concluding that Pennsylvania law controlled. Referring to the facts that the natural parents, the adopted parents, and the child were all residents and domiciliaries of Pennsylvania, the Pennsylvania Supreme Court concluded that the Commonwealth "has an overriding and continuing interest in the resolution of the issue in contention." 421 Pa. at 290–91, 218 A.2d at 767. In reaching this conclusion, the Pennsylvania Supreme Court overruled the lower court's decision that West Virginia law applied. Because the child relinquishment forms were essentially contracts, we read *Hunter* as support for our prediction that Pennsylvania will extend its *Griffith* methodology to contract actions. Any other conclusion, such as one which would limit *Hunter* only to a familial context, would in our view unduly restrict the choice of law holding of this opinion.

*Crawford v. Manhattan Life Insurance Co. of N.Y.,* 208 Pa.Super. 150, 221 A.2d 877 (1966), the next decision by the Pennsylvania Superior Court in this line of cases, acknowledges the winds of change portended by *Griffith* and *Hunter.* In an action by the beneficiary on a life insurance policy, in which the conflicts question was directly raised, the court applied both the Restatement I and *Griffith* approaches in concluding that West Virginia law would govern the controversy.

The final step in this evolution is *Gillan v. Gillan,* 236 Pa.Super. 147, 345 A.2d 742 (1975), an action in which a former husband sought to attack collaterally, on grounds of collusion, a separation agreement which he had breached. The court noted that *Griffith* had "overruled a substantial body of Pennsylvania case law and adopted the new Restatement's approach to conflicts problems." 345 A.2d at 744. In determining the governing law for the case, the court quoted extensively from Restatement II § 188, the general contracts provision. The *Gillan* court gave no indication that its holding was limited to the area of marital disputes. Based on this case,[9] and on the

---

**8.** The Superior Court's decision was a per curiam affirmance based upon the opinion of President Judge Sloane of the Court of Common Pleas.

**9.** The Supreme Court has stated that "while the decrees of 'lower state courts' should be 'attributed some weight . . . the decision [is] not controlling . . .' where the highest court of the State has not spoken on the point." *Commissioner v. Estate of Bosch,* 387 U.S. 456, 465, 87 S.Ct. 1776, 1782, 18 L.Ed.2d 886 (1967). A decision by an intermediate appellate state court is "a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest state court of the state would decide otherwise." *West v. A. T. & T. Co.,* 311 U.S. 223, 237, 61 S.Ct. 179, 183, 85 L.Ed. 139 (1940). *Cf. National Surety Corp. v. Midland Bank,* 551 F.2d 21 (3d Cir. 1977). Having analyzed *Gillan,* a decision by the Pennsylvania Superior Court, with these principles

development of Pennsylvania case law described above, we conclude that Pennsylvania would extend its *Griffith* conflicts methodology to contract actions.

Much was made by the district court of the Pennsylvania Supreme Court's decision in *In re Danz*, 444 Pa. 411, 283 A.2d 282 (1971), in concluding that it was uncertain that the *Griffith* approach would be extended to contract actions. In light of the posture in which *Danz* was decided, we think undue weight was given to that decision by the district court. *Danz* involved the validity of a contract to make a gift. The contract was executed in Germany, and involved funds held in Pennsylvania banks. The only issue raised on appeal was whether German law had been adequately proved, as required by Pennsylvania law. In affirming an unreported en banc decision of the Orphans' Court Division of the Common Pleas Court of Philadelphia County, the Pennsylvania Supreme Court reported that the court below had properly disposed of appellant's arguments. It is not apparent from the published opinion that any conflicts issue was ever raised by the parties. The lower court had evidently concluded that German law was to be applied because that was the place where the contract was made and was to be performed. 283 A.2d at 284. Since no conflicts question was put in issue on appeal, and since the choice of law determination described in the Supreme Court's opinion was that of the lower court, we are not confident that this case can be read as undermining the very clear intimation in *In re Hunter* that *Griffith* applies in contract actions.

## IV

Having have made the threshold determination that Pennsylvania would extend the *Griffith* approach to contract actions, it is necessary to apply that methodology to the present case. Since, as we have stated, we understand *Griffith* and its progeny to employ a combination of "interest analysis" and Restatement II's grouping of contacts, both these theories will be considered.

Pennsylvania is largely a disinterested forum in this case. It would appear to have little concern with any obligation imposed on American, a New York corporation, by the valid rules of New York, Delaware, or any other state. Similarly, Pennsylvania seems to have no interest implicated with respect to its resident insureds since Scott, the purchaser of the policy, was a citizen of Delaware. Although Melville, the beneficiary was at one time a resident of Pennsylvania, we believe that her relationship to the insurance contract is sufficiently subordinate to the relationship which Scott had to the contract, to entitle Pennsylvania's interest to little weight. By the same token, New York has little interest in this action. Its presumption against suicide is primarily for the benefit of New York insureds and their beneficiaries, none of whom are involved here. We have already expressed our doubts as to the weights of any deterrence interest which New York might have respecting the contractual obligations of New York residents. *See* note 5 *supra.*

This leaves us with Delaware. Unlike the district court, we think that Delaware has a substantial interest in having its law applied in this case. Application of Delaware's law would effectuate two important interests. First, any Delaware presumption against suicide may have some impact on the insurance rates paid by Delaware insureds.[10] Second, and more generally, a state has a significant interest in prescribing the standards that will govern the insurance contracts purchased by its resi-

---

in mind, we are persuaded that the Pennsylvania Supreme Court would not reach a different conclusion. Indeed, although *Gillan's* determination is not controlling, we predict that it accurately presages the extension of *Griffith* to contract actions by the Pennsylvania Supreme Court when that court is called upon to resolve the issue.

**10.** The trial judge noted that there was no evidence of record that the defendant's insurance rates varied with the domicile of the insured. However, we cannot rationally ignore a state's interest in the regulation of insurance rates, and the influence that its own law has upon them. *See Schum v. Bailey,* 578 F.2d 493 (3d Cir. 1978) (Gibbons, J., concurring).

dents to ensure that the insured and their beneficiaries will be accorded the coverage deemed adequate by the state.[11] Even if our analysis was limited to the "interest analysis" branch of the *Griffith* rule, we would conclude that Delaware law must be applied. But as we indicated earlier, *Griffith* adopted a two branch rule, combining interest analysis with Restatement II. Looking to the second branch of the *Griffith* rule, it appears that Delaware law would also be applied under the methodology prescribed by Restatement II.

Section 192 of the Restatement II, which is the section relevant to this case, provides as follows:

§ 192 Life Insurance Contracts

The validity of a life insurance contract issued to the insured upon his application and the rights created thereby are determined, in the absence of an effective choice of law by the insured in his application, *by the local law of the state where the insured was domiciled at the time the policy was applied for,* unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties, in which

event the local law of the other state will be applied (emphasis supplied).[12]

The district court judge concluded that Pennsylvania would eschew application at § 192 because that section is too inflexible. However, § 192 does not require the fixed or inflexible application attributed to it by the district court judge. To the contrary, it expressly provides that if some state, other than that in which the insured resides, has a more significant relationship to the parties and to the transaction, the law of that state will apply. This is fully consistent with the *Griffith* "flexible rule" that all relevant contacts be considered.

Since § 192 is fully consistent with *Griffith*, we conclude that it properly governs in this case. We also conclude that neither New York nor Pennsylvania has a relationship to the parties or the transaction more significant than that of Delaware such that their law would apply under the proviso to § 192.[13] Although New York is the place of business and incorporation of American, this is less significant than the fact that Scott, the purchaser of the insurance policy, was a lifelong domiciliary of Delaware, including the time at which he applied for the insurance. Accordingly, independent appli-

---

**11.** An insurance company is undoubtedly a better appraiser of actuarial risks than the purchasers of insurance. *See* R. Posner, Economic Analysis of Law 74–79 (2d ed. 1977). In particular this is so where the actuarial risks vary because of differences in the laws of the several states. Accepting this premise, it appears to us that a state may have an understandable interest in having its rules applied to the insurance contracts purchased by its residents. This permits insurance companies to make whatever rate or legal adjustments they deem necessary in light of the variations in state law.

**12.** The rationale for this section, which is explained in Comment c thereto, is fully consistent with our interest analysis. The relevant portion of Comment c reads as follows:

There are several reasons why such importance is attributed to the state where the insured was domiciled at the time the policy was applied for. Life insurance is a matter of intense public concern, as is evidenced by the fact that it has been subjected to extensive statutory regulation by the great majority of states. Issues arising under a life insurance policy should be determined by the local law of the state which has the dominant

interest in the insured with respect to these issues, and this state will usually be that where the insured was domiciled at the time the policy was applied for. Likewise, a major purpose of life insurance legislation is to protect the individual insured and his beneficiaries, and the courts have sought to assist in the achievement of this purpose by means of their choice-of-law rules. They have done so by requiring that, at least as a general rule, the insured should receive the protection accorded him by the local law of his domicil.

Restatement II § 192, Comment c.

**13.** In light of the applicability of § 192, the district court's reliance on Restatement II § 188, which pertains generally to contracts, was misplaced. This misplaced reliance caused the district court to understate both the number and significance of Delaware's contacts with this action. We observe, however, that even if § 188 may be deemed relevant in the insurance context presented by this case, we can perceive no reason why its relationship to § 192 should not be recognized to the appropriate extent.

cation of Restatement II leads us to the same conclusion that we reached when we applied "interest analysis"—Delaware law applies.

■ Since both interest analysis and Restatement II require the application of Delaware law concerning the presumption against suicide, there is no room for contending that a combination of both, as required by *Griffith*, does not require the same result. It follows that we must remand for a new trial in which Delaware's law is given effect.[14]

## V

Since we have concluded that we must reverse and remand for a new trial, it is appropriate that we address the evidentiary issue which has been raised on this appeal. Because of the nature of the documents in issue, it is highly likely that the same evidentiary dispute will be presented at the retrial. We would be remiss in discharging our function if we did not give appropriate guidance to the district court so that if the same question is again presented at trial, the district court and the parties will have the benefit of our views.

At trial, certain Airworthiness Directives prepared by the Federal Aviation Administration (FAA) were offered by Melville. American objected on the grounds that (1) they were irrelevant, (2) they constituted inadmissible opinions and hearsay, and (3) their prejudicial impact outweighed their probative value.

The Directives had been prepared by the FAA pursuant to FAA Regulations. Essentially, each Airworthiness Directive describes unsafe conditions existing in an aircraft and the fact that such a condition is likely to exist or develop in other products of the same type design. 14 C.F.R. § 39.1. No person is permitted to operate an aircraft to which an Airworthiness Directive applies except in accordance with the requirements of the directive. 14 C.F.R. § 39.3.

■ Although it is generally the rule that "reports of other accidents" are excludable on the issue of causation when similar circumstances are not proved, *Prashker v. Beech Aircraft Corp.*, 258 F.2d 602, 608–09 (3d Cir. 1958), we agree that the district court judge correctly held this principle inapplicable to the Directives at issue here, since they pertain to *classes* of planes which are similar to the one which crashed in this case. As the district court below noted, "the definition of the class to which a particular [Directive] applies excludes planes whose designs are relevantly different from the planes in which the underlying problem was discovered." *Melville v. American Home Assurance Co.*, 443 F.Supp. 1064, 1112 (E.D.Pa.1977). Also, in light of the extensive testimony at trial concerning the cause of the plane crash and the possibility of mechanical malfunctions, we find that the trial judge did not abuse his discretion when he concluded that the probative value of the Airworthiness Directives outweighed their prejudicial impact. *See* Fed. R.Evid. 403.

The opinion and hearsay objections raised by the American pose more difficult issues. The Directives were admitted as an exception to the hearsay rule under Fed.R.Evid. 803(8), which allows into evidence:

> [r]ecords, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth . . . (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report . . . or (C) . . . factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

Although the legislative history concerning the scope of this provision is equivocal, *compare* H.R.Rep.No. 93–650, 93d Cong., 1st Sess. 14, *reprinted in* [1974] U.S.Code Cong. & Admin.News, pp. 7075, 7088 *with* S.Rep.

---

14. Having reached this disposition, we have no occasion to consider the substantive content of the district court's charge to the jury which is

challenged by American as improperly reflecting the law of New York.

93–1277, 93d Cong., 2d Sess. 18, *reprinted in* [1974] U.S.Code Cong. & Admin.News, pp. 7051, 7064–65, the Advisory Committee's Notes specifically conclude that "the rule [Rule 803(8)(C)] assumes admissibility in the first instance [of evaluative reports] but with ample provision for escape if sufficient negative factors are present." Advisory Committee's Note on Rule 803, reprinted in 4 Weinstein's Evidence 803–45—803–46. The district court judge followed the Advisory Committee's Notes in concluding that the Airworthiness Directives were admissible under Rule 803(8)(C) even though they contained evaluative materials. In our opinion the trial judge was correct in this determination since the proviso to Rule 803(8)(C) permits exclusion of such reports if evidence of lack of trustworthiness is introduced.[15] This exclusionary mechanism provides a sufficient safeguard against the admission of unreliable evidence. *See* 4 Weinstein's Evidence ¶ 803(8)[03]; McCormick, Handbook of the Law of Evidence § 317 (2d ed. 1972).

 This reading of Rule 803(8)(C) reconciles it with both Rule 702 (allowing objections to the qualifications of an expert witness) and Rule 705 allowing disclosure of facts and data underlying an expert's testimony on cross-examination). Official reports are admitted as an exception to the hearsay rule because they are presumed to be generally reliable. The objections permitted by Rules 702 and 705 provide a means of testing their reliability. Before these objections may be recognized, however, the party challenging the validity of an official report admitted under 803(8)(C) must come forward with some evidence which would impugn its trustworthiness. *See Muncie Aviation Corp. v. Party Doll*

*Fleet, Inc.,* 519 F.2d 1178 (5th Cir. 1975) (FAA advisory materials admitted as exception to hearsay rule because of indicia of reliability). To allow objections to be sustained under Rules 702 and 705 without a showing of untrustworthiness would have the practical effect of nullifying the exception to the hearsay rule provided by Rule 803(8)(C).[16] On retrial, then, the Directives will be admissible unless American comes forward with evidence that would indicate their lack of trustworthiness.

### VI

We have determined that the district court erred in applying New York law. That determination requires a new trial. Accordingly, the case will be reversed and remanded for proceedings not inconsistent with this opinion.

---

**15.** Factors suggested by the Advisory Committee as reflecting on trustworthiness include: (1) the timeliness of the investigation; (2) the special skill or experience of the investigating officials; (3) whether hearings were held and at what level; and (4) possible motivation problems underlying the investigation. Advisory Committee's Note on Rule 803, reprinted in 4 Weinstein's Evidence 803–32—803–55 (1977).

The lower court's decision on this issue is fully consistent with our decision in *McShain v.*

*Cessna Aircraft Co.,* 563 F.2d 632 (3d Cir. 1977) (per curiam). We there held that the trial court did not abuse its discretion in excluding National Transportation Safety Board Reports since they constituted inadmissible hearsay. They did not fall within the exception of Rule 803(8) because the testimony of witnesses contained in the Reports did not constitute reports by officials.

**16.** We note that no evidence of untrustworthiness appears in the record.