**Bernie S. MASHUDA, Plaintiff,**

v.

**WESTERN BEEF, INC., Defendant.**

**Civ. A. No. 78–767.**

United States District Court,
W. D. Pennsylvania.

Dec. 2, 1981.

888

John W. Giltinan, Krug, Selko & Giltinan, Pittsburgh, Pa., for plaintiff.

Charles W. Kenrick, Dickie, McCamey & Chilcote, Pittsburgh, Pa., Gibson, Ochsner & Adkins, Amarillo, Tex., for defendant.

## MEMORANDUM OPINION

COHILL, District Judge.

### Introduction

Bernie S. Mashuda, an individual who resided until his recent death in Evans City, Pennsylvania, filed this action against Western Beef, Inc., a corporation with offices in Amarillo, Texas, for damages allegedly arising from the breach of a cattle feeding agreement. This Court has jurisdiction over the subject matter of Mr. Mashuda's lawsuit pursuant to 28 U.S.C. § 1332(a) (1976), which bestows original jurisdiction on the district courts over all civil actions where the amount in controversy exceeds $10,000 and the parties are citizens of different states. Venue properly lies in the Western District of Pennsylvania because the plaintiff resides in this district. See 28 U.S.C. § 1391(a) (1976).

Following a period of extensive discovery, the defendant filed a motion for summary judgment. The parties have presented the Court with briefs, supplemental briefs and oral argument on the motion.

A federal court will grant summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When considering a motion for summary judgment, a court must view the facts in the light most favorable to the non-moving party. Goclowski v. Penn Central Transportation Company, 571 F.2d 747, 751 (3d Cir. 1977); Smith v. Pittsburgh Gage and Supply Company, 464 F.2d 870, 874 (3d Cir. 1972). The movant has the burden of establishing that no genuine issue of fact exists. Scooper Dooper, Inc. v. Kraftco Corp., 494 F.2d 840, 848 (3d Cir. 1974). With these principles in mind, we now turn to an examination of the factual basis that underlies the defendant's motion.

### I.

### Factual Background

Mr. Mashuda operated on a fiscal tax year that ended on April 30th. In April

1976, he wanted to establish a cattle feeding program that would create a deferral of taxable income for two years. Working through a broker, Mr. Mashuda asked Western Beef to participate in the development of such a program. Extensive discussions among Mr. Mashuda's son, Daniel, an accountant, David Goode, two representatives of the brokerage firm of Bache Halsey Stuart Shields, Inc., and a representative of Western Beef yielded an agreement that Mr. Mashuda signed on April 22, 1976.

Under the terms of the agreement, Mr. Mashuda would provide $30,000 of equity capital to Western Beef for the purchase of three hundred head of cattle and the necessary feed. Western Beef would purchase the cattle and the feed, would place the cattle in one of its feedlots, would feed and care for the cattle in accordance with prevailing standards of animal husbandry, would market the cattle, and would deposit the proceeds from the sales in Mr. Mashuda's account. Title to the cattle and to the feed would be in Mr. Mashuda's name at all times. The seventh paragraph of the agreement read as follows:

> 7. HEDGING—It is understood between Feeder and Owner that hedging cattle or grain on commodity futures markets is a vital part of this program. Hedging will be entered into for the purpose of minimizing losses and "locking in" profits; however, such hedging may have the effect of reducing profits or "locking in" losses if a subsequent rise in market prices is experienced. Feeder shall have full authority to execute such futures transactions as in its opinion is deemed proper. Feeder agrees to finance margin requirements of hedging provided assignment of the hedging account maintained with a commodity broker is executed in proper form acceptable to Feeder's lending agency. The gain or loss plus interest on such hedging under this provision shall be for the account of Owner.

Hedging is the establishment of a position in the commodities futures market that is approximately equal to, but the reverse of, the position that the investor holds in tangible commodities. This technique minimizes the risk of financial loss in the event that commodity prices move in an unexpected direction.

Through letters dated May 6, 1976 and June 22, 1976, Western Beef informed Mr. Mashuda that it had acquired cattle for his account. It also recommended in those letters that he confer regularly with his advisors on total cost projections and on developments in the futures market.

In early November 1976, Western Beef informed Mr. Mashuda's accountant through a letter that no hedges had been placed on Mr. Mashuda's cattle, that the market price for cattle had fallen substantially, that Mr. Mashuda's account had sustained a loss of $12,000, and that Western Beef was projecting a further loss of $6,000. Western Beef explained to the accountant that it had understood the agreement to be that Mr. Mashuda, with the assistance of his broker, would conduct all hedging activities. It stated that it now inferred from the absence of hedging, however, that Mr. Mashuda had expected Western Beef to conduct the hedging activities. Finally, Western Beef expressed a willingness to modify the agreement to remedy the apparent misunderstanding and to attempt to recover the loss that Mr. Mashuda had sustained.

Representatives of Western Beef and Mr. Mashuda promptly began to discuss the possibility of modifying the agreement. As a result of these negotiations, Western Beef sent the following letter to Mr. Mashuda's accountant:

January 17, 1977

Mr. David Good
Joyce, Good and Corfield
Certified Public Accountants
Manor Oak # 2
1910 Cochran Road
Pittsburgh, Pennsylvania 19222

Re: Mr. Bernie Mashuda

Dear Mr. Good:

On April 22, 1976, Mr. Mashuda entered into a cattle feeding agreement with

Western Beef, Inc. Option VII was included in this agreement whereby all profits or losses were for the account of Mr. Mashuda. Under the contract Western provided a projected break even on cattle purchased, together with monthly accounting reports.

Subsequently, it was found that a misunderstanding existed as to who would be responsible for any hedging activities. As a result, no hedges were placed and the cattle were sold on a declining market with substantial losses. In view of this situation, Western offers the following:

1. Western and Mashuda will amend the feeding agreement to share profits and losses on an equal basis on any additional cattle purchased. However, Western will not allocate any profits to itself until the original capital of $30,000 has been recovered for Mashuda.

2. Western will purchase for Mashuda additional cattle with the objective to defer all income to future periods through consumed feed by the fiscal year ending April 30.

3. Because of the high leverage required for additional purchases, interest will be allowed to Western for any advances made at the same rates charged by the lending institution, CNT Financial Corp.

4. Western will assume all hedging responsibilities and any profits or losses from such hedging activities will be included with profits or losses from cattle sales to determine overall profitability.

5. Mashuda agrees to continue the cattle feeding activities for a minimum of three years from the initial date of the contract, and Mashuda shall have two additional one year options to continue, at his election. If, however, future losses reduces [sic] the equity capital of Mashuda below 10% of the initial capital, Westerm [sic] may terminate the cattle feeding program.

If the above is acceptable to Mr. Mashuda, will you kindly have him sign one copy of this letter and return to us.

Sincerely,

S/F.H. Simpson

F. Howard Simpson
Senior Vice President

FHS/hg

Accepted by:

_____    _____
Signature                        Date

cc: Mr. Bruce Davies
Bache & Co.
600 Grant Street
Pittsburgh, Pennsylvania 15222

Mr. Mashuda did sign and return a copy of the letter on January 31, 1977.

The plaintiff does not dispute that Western Beef conscientiously performed its duties under the modified agreement. The market price for cattle continued to decline during the first half of 1977, however. As a result, the value of the plaintiff's account fell to under $2,000.00. Pursuant to the term in the agreement that permitted Western Beef to terminate Mr. Mashuda's account if the equity capital fell to a level of less than ten percent of the initial investment, Western Beef tendered a check in the amount of $1,758.65 to Mr. Mashuda on July 15, 1977. Mr. Mashuda refused to accept the check and filed this lawsuit.

The plaintiff alleges that Western Beef breached the cattle feeding agreement by failing to place hedges during the period May 1976 through November 1976. The defendant has moved for summary judgment on the basis of two affirmative defenses. First, Western Beef contends that the completed performance of its duties under the modified agreement acted as an accord and satisfaction for any claims arising from the alleged breach of the original contract. Second, Western Beef argues that the plaintiff is estopped from now asserting that it had a duty under the original agreement to place hedges because the plaintiff acknowledged in the modified agreement that a misunderstanding had existed about the assignment of hedging responsibilities.

## II.

### Choice of Law

■ Before addressing the two affirmative defenses that underlie the defendant's motion for summary judgment, we must determine whether the law of Texas or the law of Pennsylvania controls the disposition of the substantive issues. In a diversity action, a federal district court must apply the choice of law rules of the forum state. *See Klaxon Company v. Stentor Electric Manufacturing Company*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

■ Pennsylvania's choice of law rules have undergone considerable revision in recent years. *See, e.g., Melville v. American Home Assurance Company*, 584 F.2d 1306, 1311–13 (3d Cir. 1978); *Griffith v. United Air Lines, Inc.*, 416 Pa. 1, 11–23, 203 A.2d 796, 801–06 (1964). The current rule governing breach of contract actions directs the courts to make their choice of law by means of a two-part analysis that considers both the significant contacts that the contract has with the various jurisdictions and the interest, if any, that the various jurisdictions have in the subject matter of the contract. *See Melville v. American Home Assurance Co.*, 584 F.2d 1306, 1311–13 (3d Cir. 1978); *Jewelcor Inc. v. St. Paul Fire and Marine Insurance Co.*, 499 F.Supp. 39, 41–42 (M.D.Pa.1980).

■ In the present case, we find that the cattle feeding agreement had far more significant contacts with Texas than it had with Pennsylvania because Western Beef performed the contract entirely within Texas. Pennsylvania's only connection with the contract was that the passive investor resided in the Commonwealth. Moreover, Pennsylvania's only significant interest in contracts such as the cattle feeding agree-

ment is to insure that those residents who invest in tax-saving vehicles are not defrauded. Western Beef addressed that concern by filing information about the cattle feeding program with the Commonwealth before the parties executed the contract. Mr. Mashuda's complaint does not contain any allegation of common law fraud or a violation of the Pennsylvania "blue sky" law.[1] Instead, the current dispute arose from the failure of the defendant to hedge, which was the result either of a misunderstanding or negligence. The Commonwealth does not have a strong interest in such a dispute, especially when the resident investor had the assistance of professional financial advisers.

In the absence of a strong interest in the litigation on the part of Pennsylvania and in light of the overwhelming number of contacts between the contract and Texas, we hold that Texas law governs the disposition of the substantive issues in this case. We now turn to an examination of the defendant's contention that the plaintiff's action is barred, as a matter of law, by both the doctrine of accord and satisfaction and the doctrine of estoppel by contract.

## III.

### Accord and Satisfaction

■ The defendant asserts that Mr. Mashuda's acceptance of the modification of the original contract acted as an accord and satisfaction for any claims that Mr. Mashuda may have had arising from Western Beef's performance under the original contract. " 'An agreement between two parties to give and accept something of value in satisfaction of a right of action which one has against the other is an accord, and the execution of this agreement is a satisfaction. The term 'accord and satisfaction,' therefore, applies to the completed transac-

---

1. The only count of the plaintiff's initial complaint and count one of the plaintiff's amended complaint alleged that the defendant had violated section 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l* (1976), by selling a security through the use of oral and written communications that included an untrue statement of material fact or that omitted to state a material fact that was necessary in order to make the communication not misleading. The Court dismissed count one of the amended complaint, however, upon motion by the plaintiff's counsel and with the consent of counsel for all other parties.

tion, and constitutes a bar to any action on the original contract.'" *Ensley v. Spickard*, 232 S.W.2d 780, 782 (Tex.Civ.App.1950) (quoting *Buford v. Inge Construction Co.*, 279 S.W. 513, 515 (Tex.Civ.App.1925)). *See Houchins v. Scheltz*, 590 S.W.2d 745, 750–51 (Tex.Civ.App.1979). A movant for summary judgment has the burden of conclusively establishing the affirmative defense of accord and satisfaction. *See George Linskie Company v. Miller-Picking Corp.*, 463 S.W.2d 170, 172–73 (Tex.1971). The Supreme Court of Texas provided lower courts with extensive guidance on the nature of this burden in *Jenkins v. Henry C. Beck Company*, 449 S.W.2d 454 (Tex.1969), explaining that

> the affirmative defense of accord and satisfaction ... rests upon a new contract, express or implied, in which the parties agree to the discharge of the existing obligation by means of the lesser payment tendered and accepted. *Industrial Life Insurance Company v. Finley*, 382 S.W.2d 100 (Tex.Sup.1964). The evidence must establish an assent of the parties to an agreement that the amount paid by the debtor to the creditor was in full satisfaction of the entire claim. *McCarty v. Humphrey*, 261 S.W. 1015 (Tex.Com.App.1924, judgment adopted). The minds must meet and where resting in implication the facts proved must irresistibly point to such conclusion. *Simms Oil Co. v. American Refining Co.*, 288 S.W. 163 (Tex.Com.App.1926). There must be an unmistakable communication to the creditor that tender of the lesser sum is upon the condition that acceptance will constitute satisfaction of the underlying obligation. It has been said that the conditions must be made plain, definite and certain, *Clay v. Rossi*, 62 Idaho 140, 108 P.2d 506 (1940); that the statement accompanying the tender of a sum less than the contract price must be so clear, full and explicit that it is not susceptible of any other interpretation. *Sanders v. Standard Wheel Co.*, 151 Ky. 257, 151 S.W. 674 (1912); that the offer must be

accompanied with acts and declarations which the creditor is "bound to understand," *Preston v. Grant*, 34 Vt. 201 (1861); *Crucible Steel Co. v. Premier Mfg. Co.*, 94 Conn. 652, 110 A. 52 (1920). 449 S.W.2d at 455.

■ We hold, as a matter of law, that Western Beef conclusively has established the requirements for an accord and satisfaction. On January 31, 1977, Mr. Mashuda accepted a substantial modification to the original contract. Western Beef gave consideration for this modification. Under the terms of the modified agreement, Western Beef was to participate directly in the profits or losses of Mr. Mashuda's cattle feeding program. It would not allocate any profits to itself, however, until Mr. Mashuda recovered his original capital. Thus, Western Beef accepted the risk of incurring substantial losses in an effort to reverse the erosion of Mr. Mashuda's investment.[2]

The letter containing the proposal for modifying the contract did not state explicitly that Mr. Mashuda's acceptance of the modification would discharge the existing obligation and any claims arising from the existing obligation. Nevertheless, Mr. Mashuda reasonably could have drawn from the language of the letter no other conclusion than that Western Beef was proposing to modify the agreement in return for a discharge of all duties under the existing contract. The crucial language in the letter read as follows:

> Subsequently, it was found that a misunderstanding existed as to who would be responsible for any hedging activities. As a result, no hedges were placed and the cattle were sold on a declining market with substantial losses. In view of this situation, Western offers the following:
>
> 1. Western and Mashuda will amend the feeding agreement to share profits and losses on an equal basis on any additional cattle purchased. However, Western will not allocate any profits to itself until the original capital of $30,000 has been recovered for Mashuda.

---

**2.** The defendant did lose approximately five thousand dollars while participating in Mr. Ma-

shuda's cattle feeding program under the modified contract.

2. Western will purchase for Mashuda additional cattle with the objective to defer all income to future periods through consumed feed by the fiscal year ending April 30.

. . . .

4. Western will assume all hedging responsibilities and any profits or losses from such hedging activities will be included with profits or losses from cattle sales to determine overall profitability.

. . . .

If the above is acceptable to Mr. Mashuda, will you kindly have him sign one copy of this letter and return to us.

The first paragraph of the quoted language clearly indicated that Western Beef was proposing the modification on the assumption that a misunderstanding between the parties had occurred. In response to the misunderstanding and the resulting erosion of Mr. Mashuda's capital, Western Beef offered Mr. Mashuda an opportunity to recover his loss through an arrangement that would involve direct participation by Western Beef.

If Mr. Mashuda believed that Western Beef had breached the original contract and that Western Beef's proposal was not an adequate accommodation for this breach, he could have rejected the proposal and filed a lawsuit immediately. Instead, he chose to accept Western Beef's proposal, knowing that it was designed to recover his capital and that it would expose Western Beef to some financial risk. Mr. Mashuda should have known that Western Beef would not offer to undertake new duties unless the prior obligation would be discharged. He could not have given Western Beef's proposal any other reasonable interpretation.

Western Beef completely performed its duties under the modified agreement. Complete performance of the accord is a satisfaction that discharges the party from all liability under the initial contract. *See Alexander v. Handley*, 136 Tex. 110, 116–17, 146 S.W.2d 740, 743 (1941). *See generally* Comment, *Executory Accord, Accord And Satisfaction, And Novation—The Distinctions*, 26 Baylor L.Rev. 185, 185–87 (1974).

Therefore, the accord and satisfaction bars Mr. Mashuda's present claim.

## IV.

### *Estoppel By Contract*

The defendant also has moved for summary judgment on the ground that the plaintiff's acceptance of the modification of the contract estops him from now claiming that the defendant had breached the original contract by failing to hedge. "Estoppel by contract is a form of 'quasi estoppel' based upon the idea that a party to a contract will not be permitted to take a position inconsistent with its provisions, to the prejudice of another." *Hawn v. Hawn*, 574 S.W.2d 883, 886 (Tex.Civ.App.1978).

In *United Fidelity Life Insurance Co. v. Fowler*, 38 S.W.2d 128 (Tex.Civ.App.1931), the leading Texas case on estoppel by contract, the court held that a party to a contract would not be permitted to later deny a fact that the parties had agreed upon or assumed as a basis for the negotiation of the contract. The *Fowler* case arose from a dispute between an insurance agent and his principal. Floyd Fowler sued United Fidelity Life Insurance Company to recover commissions, bonuses and renewal fees that he allegedly had earned as a sales agent for United Fidelity and to recover actual and exemplary damages for certain tortious conduct that United Fidelity allegedly had committed during their business relationship. United Fidelity denied that it owed any compensation to Mr. Fowler or that it had acted toward him in a tortious manner. Moreover, United Fidelity asserted a counterclaim against Mr. Fowler, alleging that he owed the insurance company approximately four thousand dollars.

The jury found against Mr. Fowler on his tort claim and against United Fidelity on the counterclaim. It found in favor of Mr. Fowler, however, on his claim for payment of certain commissions, bonuses and renewal fees.

On appeal from the adverse judgment on Mr. Fowler's breach of contract claim, the

defendant argued, *inter alia*, that the trial court had erred in submitting Interrogatory No. 3 to the jury. This interrogatory and the jury's answer to it read as follows:

"Special Issue No. 3: Was the defendant indebted to the plaintiff in any amount on April 15, 1924? Answer Yes or No. Answer: Yes.

"If you have answered Special Issue No. 3 by 'Yes,' then answer the following subsection (a): (a) How much was such indebtedness? Answer: $3133.42.

38 S.W.2d at 129–30. The defendant contended that the jury's finding on this issue was in direct conflict with certain provisions of the contract that Mr. Fowler and United Fidelity had executed on April 15, 1924. The relevant provisions of that contract read as follows:

"2. A new contract will be issued superseding temporarily your old contract, which new contract is attached.

"3. All settlements taken under this new arrangement whether in notes or cash, will be turned over to the company to be held as collateral to the note thus created, and the $200 per month advance above referred to.

"4. Excess funds, if any, are to be used by the company in reducing your present or old indebtedness as rapidly as possible.

"5. The new contract which is taken, and of which this is a part, is to remain effective until all indebtedness to the company has been wiped out. At that time, unless paragraph 15 is accomplished your old contract will go into full force and effect. The old contract in the interim is to remain dormant, with the exception of renewals, which will be paid so long as the qualifications required under the new contract are met. . . .

"8. This contract is to be in full force and effect for one year from date unless old accounts are wiped out prior to that time. . . .

"15. If all indebtednesses are wiped out within one year from today, old contract will be retroactive to include all business from this date.

"16. On notes that we know to be good we will discount 10% and apply on balance due the company. This is at the discretion of the Vice President & General Manager."

38 S.W.2d at 130. Although the contract did not specify the amount of Mr. Fowler's indebtedness, the Court of Civil Appeals observed that it clearly did indicate that Mr. Fowler "was then indebted to defendant in some amount, that the parties contracted with reference to that fact, and provided for its reduction or payment from plaintiff's future earnings." *Id.*

In rebuttal, the plaintiff in that case alleged that the indebtedness referred to in the contract involved only secondary liability for amounts that some of the plaintiff's subagents owed to United Fidelity. The plaintiff represented to the Court of Civil Appeals (1) that each subagent had executed a bond in favor of United Fidelity that would indemnify the insurance company for all amounts that the subagents owed, (2) that the plaintiff had agreed to the language in the contract because he did not want to risk losing a potentially profitable business by offending United Fidelity, (3) that the defendant orally had promised to pursue its rights directly against the subagents, and (4) that the defendant ultimately refused to enforce the bonds against the subagents as part of its tortious plan to sever its business relationship with the plaintiff.

Although the Court of Civil Appeals accepted the plaintiff's allegations as true for purposes of reviewing the lower court's decision, the appellate court held "that plaintiff is estopped to deny that he was indebted to defendant on April 15, 1924; therefore, the submission of the issue was not authorized, and the finding of the jury in response thereto is without evidence to sustain it." 38 S.W.2d at 130–31. The court noted that the plaintiff had not attempted to have the contract cancelled or annulled on the ground of fraud, accident or mistake. *Id.* at 132.

■ Applying to the present case the law as set forth in *United Fidelity Life Insur-*

ance *Co. v. Fowler*, we hold that the plaintiff is estopped from denying that a misunderstanding had occurred about the assignment of the responsibility for hedging. The crucial portion of the letter that contained the proposed modification to the agreement read as follows:

> Subsequently, it was found that a misunderstanding existed as to who would be responsible for any hedging activities. As a result, no hedges were placed and the cattle were sold on a declining market with substantial losses. In view of this situation, Western offers the following
> . . . .

The letter explicitly stated that Western Beef was offering to modify the agreement because of the existence of a misunderstanding about hedging. If Mr. Mashuda had responded to the letter by reserving the right to later claim that Western Beef had breached the original contract, Western Beef undoubtedly would have withdrawn its offer to modify the contract. Under the doctrine of estoppel by contract, the plaintiff now is barred from denying the existence of a fact that served as the foundation for the defendant's decision to modify the agreement and to become directly involved in the profits or losses of the cattle feeding program.

### Conclusion

On January 31, 1977, Bernie S. Mashuda chose to accept a proposal by Western Beef, Inc. to modify his cattle feeding program in an effort to regain the capital that had eroded as a result of an absence of hedging. Western Beef subsequently completely performed its duties under the modified agreement. In response to Western Beef's motion for summary judgment, we conclude as a matter of law that complete performance of the modified agreement acted as an accord and satisfaction for any breach of contract claims arising from the original agreement. Moreover, we hold that Mr. Mashuda is estopped from alleging that Western Beef breached the cattle feeding agreement by failing to place hedges because he necessarily knew that Western Beef was offering to modify the agreement on the assumption

that a misunderstanding had occurred about the assignment of responsibility for hedging. We shall enter an appropriate order implementing our conclusions of law.